130 Cal.Rptr.2d 734 (2003)
106 Cal.App.4th 39
MITSUBISHI MATERIALS CORPORATION et al., Petitioners,
v.
The SUPERIOR COURT of Orange County, Respondent;
Frank H. Dillman et al., Real Parties in Interest.
No. G030056.
Court of Appeal, Fourth District, Division Three.
February 6, 2003.
As Modified March 7, 2003.
Review Granted April 30, 2003.
*735 Morrison & Foerster, Kathleen V. Fisher, Arne D. Wagner and H. Mark Mersel, Irvine, for Petitioners.
Robert D. McCallum, Jr., Assistant Attorney General of the United States, John S. Gordon, United States Attorney; Mark Stern, Douglas Hallward-Driemeier, Kathleen Kane, United States Department of Justice; James G. Hergen and Lara A. Ballard, United States Department of State, for the United States of America as Amicus Curiae on behalf of Petitioners.
No appearance for Respondent.
Herman, Mathis, Casey, Kitchens & Gerel, David S. Casey, Jr., and Bonnie E. Kane, San Diego, for Real Parties in Interest.
Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, Louis Verdugo, Jr., Senior Assistant Attorney General, Catherine Z. Ysrael, Supervising Deputy Attorney General, and *736 Angela Sierra, Deputy Attorney General, for the State of California as Amicus Curiae on behalf of Real Parties in Interest.

OPINION
SILLS, P.J.

I
Before us are claims by surviving American prisoners of war against a number of Japanese companies for whom they were forced to do slave labor during World War II. It is a remarkable case, one in which the Attorney General of the United States and the Attorney General of the State of California are on opposite sides.
The immediate cause of the litigation is a recent change to our state law which was intended to allow "Second World War slave labor" victims to bring a lawsuit to recover compensation under state law for their labor against private companies who benefited by that labor during the war. (Code Civ. Proc, § 354.6.) The legislation actually creates a state law claim which would not otherwise exist,[1] or if it ever did exist, would have been long since barred by the statute of limitations.[2] Our state Attorney General seeks to uphold the law against the federal Attorney General's argument that all claims by American nationals against Japanese nationals were settled in the 1951 peace treaty that formally ended World War II between the United States and Japan. (Multilateral Treaty of Peace with Japan, Sept. 8, 1951, 3 U.S.T. 3169, T.I.A.S. No. 2490 (Peace Treaty).
The plaintiffs here are survivors of Japanese prisoner of war camps who have brought this lawsuit against a group of Japanese companies, mainly Mitsubishi and Mitsui, for whom they were forced to work in World War II. The trial court overruled the demurrers of the Mitsui companies and denied the motion for judgment on the pleadings brought by the Mitsubishi companies.
Regrettably, as we explain below, the federal government has the better part of the argument regarding the effect of the treaty. Simply put, it precludes this lawsuit from going forward.[3]
*737 Ordinarily appellate courts are reluctant to entertain writ proceedings based on erroneously overruled demurrers or improperly denied judgments on the pleadings. However, because the plaintiffs are World War II veterans, we issued an order to show cause so that the merits of the argument regarding the effect of the treaty could be expeditiously considered. It would be a disservice to these heroes of World War II to create the false hope of some sort of monetary recovery by permitting a lengthy trial only to reverse the judgment years later because federal law, as expressed in the treaty, required it.
However, the very process of explaining the effect of the treaty also requires that we recognize the sacrifice of these plaintiffs. That sacrifice deserves to be explicitly recognized by the judiciary of this country, regardless of the validity of the legal claims they are now making, indeed, all the more so in light of our determination that the 1951 treaty precludes this lawsuit. The unique circumstances of this case, including the special nature of the plaintiffs' claims arising out of a world war, compel the conclusion that these plaintiffs be given a forthright, honest explanation why their government waived their rights to seek redress in American courts against the companies that benefited from their slave labor.

II
We must begin by acknowledging the obvious: This case involves a treaty made by the federal government of the United States, and it is binding on us as a state court. In fact, the Constitution specifically mentions state courts in making treaties the "supreme Law of the land." Article 6, clause 2 of the United States Constitution provides that "all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." As a treaty it therefore trumps any law of the State of California.
While treaty analysis obviously begins with the text of the treaty itself (e.g., El Al Israel Airlines, Ltd. v. Tseng (1999) 525 U.S. 155, 167, 119 S.Ct. 662, 142 L.Ed.2d 576), federal and state courts regularly look to the historical context of a treaty to elucidate its meaning, particularly where any terms are ambiguous or where the treaty is silent on a point. (E.g., Hosaka v. United Airlines, Inc. (9th *738 Cir.2002) 305 F.3d 989, 998 [because Warsaw Convention was silent on the availability of the doctrine of forum non conveniens, court considered historical context in which particular amendment had been offered]; Bruguier v. Class (S.D.1999) 599 N.W.2d 364, 374-375 [looking to historical context of treaty to determine whether a particular Indian reservation would continue].)
Because "`[t]reaties are construed more liberally than private agreements, ... to ascertain their meaning we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties.'" (Air France v. Saks (1985) 470 U.S. 392, 396, 105 S.Ct. 1338, 84 L.Ed.2d 289; accord Chan v. Korean Air Lines (1989) 490 U.S. 122, 134, 109 S.Ct. 1676, 104 L.Ed.2d 113 [recognizing that drafting history may be consulted to shed light on ambiguous text of treaty (opinion by Scalia, J.) ].) Even plain language must be viewed in its historical context. (Oregon Dep't of Fish and Wildlife v. Klamath Indian Tribe (1985) 473 U.S. 753, 774, 105 S.Ct. 3420, 87 L.Ed.2d 542 ["even though `legal ambiguities are resolved to the benefit of the Indians,' ... courts cannot ignore plain language that, viewed in historical context and given a `fair appraisal,' ... clearly runs counter to a tribe's later claims"]; see also Curry v. U.S. Forest Service (W.D.Pa.1997) 988 F.Supp. 541, 548 [noting that historical context of migratory bird treaty further demonstrated the intent of the treaty beyond its text not to apply to the federal government itself].)
In the present case, historical context is particularly important because it eliminates doubt in the language as to whether the treaty was intended to cover the claims of American POWs against private Japanese companies. Specifically, there are a number of places where the 1951 treaty is either vague (in the sense that people of ordinary intelligence have to guess at the meaning of words) or ambiguous (in the sense that words have multiple meanings), and consequently in need of clarification by reference to the surrounding circumstances under which the agreement was made.
One, in Article 14(b) of the treaty, the victorious Allied nations "waive" claims of "their nationals" arising out of the "prosecution" of the war against Japan and Japanese "nationals." (Peace Treaty, supra, 3 U.S.T. at p. 3183.) According to the plaintiffs, the word "waive" should not be construed to extinguish actions brought in American state courts under state law because the reference to the claims of the Allied Powers and their nationals necessarily implicates international claims only. Along those same lines, the reference to Japanese "nationals" raises the question of whether the word should be construed to include corporate entities, such as the defendants here, which have, in the post-war era, grown into large multinational corporations.
Also, Article 14(b) uses the phrase "prosecution of the war." (Peace Treaty, supra, 3 U.S.T. at p. 3183.) According to the plaintiffs, the word "prosecution" should not be interpreted to include actions which are contrary to international law. In particular, they point out that while the 1929 Geneva Convention (specifically Article 31) allowed POWs to be forced to do labor, that labor cannot have any connection with the operation of the war (such as putting POWs to work making munitions). They reason that since their own labor was in connection with the Japanese war effort, it was "illegal" under the Geneva Convention and therefore not part of the "prosecution" of the war.
Further, as plaintiffs strenuously point out, Article 14where Allied claims are waiveddoes not parallel Article 19 where the Japanese waive their claims against the Allied powers and their nationals. (Peace Treaty, supra, 3 U.S.T. at pp. *739 3187, 3188.) What's more, the Japanese waiver in Article 19 contains a specific reference to Japanese POWs, yet the Allied waiver in Article 14 contains no specific reference to Allied POWs. For the plaintiffs, the asymmetry is itself significant, in that it shows that the claims of Allied POWs, unlike the claims of Japanese POWs, were not being waived.

A
The proper place to begin is with the sufferings endured by Americans taken prisoner by the Japanese in World War II, for those sufferings surely gave them many claims.
Most of the plaintiffs were taken prisoner in the spring after the surrender of Bataan in April 1942.[4] Then came the infamous "Bataan Death March," where prisoners, most weak and ill, were prodded by bayonets to march in the tropical heat for six days and nights with hardly any food and water.[5] If they failed to keep up they were run through.
The prisoners were eventually put into "hell ships" to be taken to Japan. POW ships are supposed to be marked, so that one side does not attack its own nationals. The hell ships, however, were unmarked, and in fact a number were sunk by American submarines en route to Japan.[6]
The conditions were horrendous, and bespoke gratuitous cruelty. The prisoners were packed like sardines into hatches, which were always sealed; sick prisoners could not get air. Typically the prisoners were not allowed to empty the oilcans used as latrines more than twice a day, despite the fact that most of them were suffering from diarrhea, and the cans were overflowing.[7]
Once in Japan, the prisoners were forced into slave labor for private Japanese companies (usually mining) that supplied the Japanese war effort. As the plaintiffs themselves now point out, the use of that forced labor was contrary to clearly established international law regarding the use of the labor of prisoners of war.[8]
The experience of Frank Bigelow, a veteran of Corregidor, was typical: "Everyday the Japanese Army delivered us to a coal mine owned by Mitsui, one of the biggest business conglomerates in Japan, and we were their slave labor. Mitsui Mining was right up there in front and we were told to work or dielong hours, *740 short rations. Usually, tiny portions of rice and seaweed soup could barely sustain us as we were doing physical, heavy labor. I was skin and bones, and at 6 foot, 4 inches, I weighed just 95 pounds."[9]
There were constant beatings, which would increase whenever the United States won an important battle.[10] Over 11,000 of the approximately 27,000 Americans captured and interned by the Japanese military during World War II died. Chinese prisoners of war fared even worse. Of the tens of thousands captured, at war's end Japanese authorities acknowledged having only 56 Chinese prisoners.[11]
The enslavement of American POWs to benefit the Japanese war effort and private Japanese companies was well known after the War. In 1947, the British held war crime trials in Hong Kong, indicting civilian employees of the Nippon Mining Company for the maltreatment of prisoners of war forced to labor in the Kinaseki Mine in Formosa. Eight of the nine were found guilty and sentenced to various terms of imprisonment.[12]
Then there was the post-war prosecution in American courts of Tomoya Kawakita for treason. Kawakita was an American citizen who had been hired to work for a private mining company interpreting communications with POWs who were "mostly from Bataan" and who were forced to work in his company's mines. (See Kawakita v. United States (1952) 343 U.S. 717, 737, 72 S.Ct. 950, 96 L.Ed. 1249.) Kawakita returned to the United States in 1946, but was recognized by former American POWs, arrested, and tried for treason. (Id. at p. 721, 72 S.Ct. 950.) Reviewing the evidence, the federal district court had said in 1950 that by "his brutal, slave-driving tactics," Kawakita had "added many tons of nickel ore to Japan's war effort that never otherwise would have been mined or smelted by American prisoners of war." (United States v. Kawakita (S.D.Cal.1950) 96 F.Supp. 824, 837.)
After the war, Japanese-owned assets in the United States and its territories were seized by the Office of Alien Property, which operated under the auspices of the United States Justice Department. State Department estimates place the total amount seized at about $90 million.[13] The proceeds were placed in a War Claims Fund for ultimate distribution to the POWs.[14] It amounted to $1.00 a day for *741 missed meals and $1.50 per day for lost wages.[15]

B
We now turn to the circumstances under which the treaty was made.
When most Americans think of the end of the war with Japan they think of the formal surrender ceremony on the battleship Missouri that took place in September 1945 shortly after the bombing of Hiroshima and Nagasaki. Most do not realize that it was not until the early 1950's, in the midst of another war, that the treaty formally ending World War II with Japan was finally negotiated and concluded.
There can be no doubt that the Korean War gave a special impetus to concluding the treaty with Japan. The main theme of President Truman's opening address to the conference on the Japanese Peace Treaty, held at the same San Francisco opera house where the United Nations was founded was the need to "restore" a sovereign Japan to the company of American allies so that it could help serve as a bulwark against Communist aggression in Korea. (See Public Papers of the Presidents of the United States Harry S. Truman, 1951 (U.S. Gov. Printing Office 1965) at pages 504 through 508 (hereinafter Truman Papers).)
In his address Truman recounted the changes which had occurred in Japan in the short span of six years. The secret police had been abolished. The Japanese people had a new constitution with a bill of rights. Universal suffrage had been established. There were now free and independent labor unions. It was time "to restore full sovereignty to the Japanese people." (Truman Papers, supra, at p. 505.)
Truman then stressed the urgency of the task by alluding to recent military offensives launched in Korea. "Unfortunately, today, the world is faced with new threats of aggression. Many of the countries represented here are now engaged in a hard fight to uphold the United Nations against international lawbreaking. There are thugs among nations, just as among individuals." (Id. at p. 504.)
Truman also spoke about the subject of reparations, in words that have particular significance to the case at bar. He reminded his audience that the United States had not forgotten Bataan (Truman Papers, supra, at p. 505). But he juxtaposed that thought with another one, going in the opposite direction: The new treaty did not "contain the seeds of another war." (Truman Papers, supra, at p. 506.) The tenor of Truman's remarks was that Japan was being welcomed into the company of Allied nations despite what had happened during World War II.
The reference to "seeds of another war" was an obvious allusion to the Versailles treaty that had ended World War I. John Foster Dulles, the chief American negotiator of the treaty that ended World War II with Japan, had himself been at the Versailles negotiations, and had in fact served on the Reparations Commission.[16] Historians, of course, may debate the causes of World War II forever, and in particular the role heavy reparations against Germany *742 may have played.[17] We need not enter that fray. However, it is clear that the key American decisionmaker involved in the treaty, John Foster Dulles, accepted the conventional wisdom of his day that heavy reparations against Germany had played a major part in bringing about the rise of Hitler and the subsequent war.[18]
The need to spare the Japanese economy from heavy reparations was also a major reason the Senate Foreign Relations Committee was willing to go along with the treaty. In its report recommending approval of the treaty, the committee said: "Obviously insistence upon the payment of reparations in any proportion commensurate with the claims of the injured countries and their nationals would wreck Japan's economy, dissipate any credit that it may possess at present, destroy the initiative of its people, and create misery and chaos in which the seeds of discontent and communism would flourish." (Sen.Rep. No. 82-2, 2d Sess.(1952), emphasis added.)

C
Besides the need to cultivate Japan as an American ally against Communist aggression and the concomitant need to protect its economy from heavy reparations, there was another motivating force for the 1951 treaty, though not one mentioned by Truman: The danger of a cycle of recriminations *743 when each side perceives itself to have been the object of grievous wrongs. There was a need for a mutual release of war claims to assure lasting peace.
We have already mentioned the suffering of American prisoners of war endured at the hands of the Japanese Army and at the hands of private Japanese companies. What we have not mentioned to this point is that the Japanese felt that they too had claims. Few Americans are aware that in 1963 a Japanese court, in what has become known as the Shimoda case, held that the United States had violated international law by bombing Hiroshima and Nagasaki.[19] Regardless of whether one agrees with that decision (in fact, in an ironic twist, in the Shimoda case the Japanese government took the American side and argued that the United States hadn't violated international law), the main significance of the case for our purposes is what the court actually did. It found against the plaintiffs because even though the Shimoda court was willing to say that the United States had violated international law, it also said that Japan had waived the right of its nationals to recover against the United States because of the 1951 treaty.
The use of nuclear weapons at Hiroshima and Nagasaki and the treatment of American POWs in Japan were not unrelated events. In fact, one of the main reasons given by President Harry S. Truman for the use of nuclear weapons on Hiroshima and Nagasaki was the mistreatment of American prisoners of war. In a radio address to the American people on the very day of the Nagasaki bombing,[20] Truman said: "Having found the bomb we have used it. We have used it against those who attacked us without warning at Pearl Harbor, against those who have starved and beaten and executed American prisoners of war, against those who have abandoned all pretense of obeying international laws of warfare."
Without a waiver of all war crime claims that could have been brought by either side, Japan and the United States might have wrangled endlessly about liabilities arising out of the war.[21]

*744 III

A
With that context as a backdrop, we now turn to the text of the treaty itself. The actual language of a treaty is, after all, the ultimately dispositive source of judicial decisionmaking. (E.g., Chan v. Korean Air Lines, supra, 490 U.S. at p. 134, 109 S.Ct. 1676 ["We must thus be governed by the text...."].)
Allied prisoners of war were the subject of Article 16 of the treaty. That provision states: "As an expression of its desire to indemnify those members of the armed forces of the Allied Powers who suffered undue hardships while prisoners of war of Japan, Japan will transfer its assets and those of its nationals in countries which were neutral during the war, or which were at war with any of the Allied Powers, or, at its option, the equivalent of such assets, to the International Committee of the Red Cross," which would "liquidate such assets and distribute the resultant fund to appropriate national agencies, for the benefit of former prisoners of war and their families on such basis as it may determine to be equitable." (Peace Treaty, supra, 3 U.S.T. at p. 3185.)
Article 14 covered the subject of Allied claims against Japan and is at the center of the current controversy. Article 14 begins by explicitly recognizing that Japan couldn't pay for all the damages and suffering it had caused: "It is recognized that Japan should pay reparations to the Allied Powers for the damage and suffering caused by it during the war. Nevertheless it is also recognized that the resources of Japan are not presently sufficient, if it is to maintain a viable economy, to make complete reparation for all such damage and suffering and at the same time meet its other obligations." (Peace Treaty, supra, 3 U.S.T. at p. 3180, emphasis added.)
The next paragraph, Article 14(b) contains the waiver language. Here is its complete text: "Except as otherwise provided in the present Treaty, the Allied Powers waive all reparations claims of the Allied Powers, other claims of the Allied Powers and their nationals arising out of any actions taken by Japan and its nationals in the course of the prosecution of the war, and claims of the Allied Powers for direct military costs of occupation." (Peace Treaty, supra, 3 U.S.T. at 3183, emphasis added.)

B
In light of the historical circumstances mentioned above, a number of the questions inherent in the text of Article 14(b) are readily resolved. The United States government was fully aware of the heinous treatment of American POWs; Truman had, in fact, justified the use of atomic weapons precisely because of that treatment. Recompensing the POWs would be ruinous to the Japanese economy, as recognized by Truman in his speech and by the Senate Foreign Relations Committee report, and impliedly in the first part of Article 14 which stressed the need to develop a viable Japanese economy. It logically follows that even allowing POWs to pursue private claims against the large Japanese companies who had exploited their labor would be ruinous as well. An economy dominated by these "zaibatsu" would suffer greatly if they could be subjected to such claims, particularly if litigated *745 in American courts in front of American juries. These were large companies, dominating the Japanese economy. To allow claims against them would stifle whatever prospects there were for a prosperous Japan in the post-war world.
By the same means the argument that POW claims for forced labor did not arise in the course of the "prosecution" of the war effort is resolved as well. It may not have been legal to force American POWs to do work for the Japanese war effort, but it surely created "other claims" which, if litigated and properly compensated in American courts, would have a devastating effect on the Japanese economy. It bears repeating in this regard that the plaintiffs were members of the American armed forces taken prisoner by the Japanese Army after Pearl Harbor during the war in the Pacific. All were forcibly held in POW camps maintained by the Japanese Army during the war. They could have done no work for any private person except compelled to do so by the Japanese Army in wartime. When they tell the stories of their day-to-day existence in the Japanese POW camps, their days invariably began with being marched by the Japanese Army to some facility operated by a private company. And their work, as the federal district court noted when the Kawakita treason case was tried, "added many tons of nickel ore to Japan's war effort." (See United States v. Kawakita, supra, 96 F.Supp. at p. 837.) It is telling, in that regard, that the first named defendant in this case was part of the conglomerate that made the Zero (the name comes from "Mitsubishi Type 0"), Japan's main fighter plane.
Indeed, no other result would be consistent with the Kawakita treason case as it was finally decided by the United States Supreme Court in 1952. As mentioned above, Kawakita was an American who worked as an interpreter in a private mine, namely the Oeyama Nickel Industry Co, Ltd. When he was prosecuted for treason, his main defense was that he had already renounced his citizenship by virtue of accepting employment for the company, which he claimed was the performance of duties "under the government" of Japan. (See Kawakita v. United States, supra, 343 U.S. at p. 727, 72 S.Ct. 950.)
The Supreme Court rejected that defense. Kawakita didn't work for the government. Though he took orders from the military, he wore an insignia showing that he was a civilian; he had no duties to perform toward the POWs except as an interpreter. The fact that the company was part of the Japanese "war economy" did not change his status from private to governmental. (Kawakita v. United States, supra, 343 U.S. at pp. 727-728, 72 S.Ct. 950.)[22] Even so, the United States *746 Supreme Court upheld Kawakita's treason conviction precisely because his conduct toward his fellow American citizens in the mines, even as a private employee of a Japanese company, still gave aid and comfort to the Japanese war effort.
The overt acts which formed the basis of the conviction included incidents straight out of the complaints in the case before us. Kawakita regularly swore at the prisoners, beat them, threatened them, and punished them if they showed the least bit of tiredness. In one instance, he kicked an American POW when, after becoming ill and dizzy, he slowed down in lifting pieces of ore rocks from the tracks. In another, he struck a prisoner who was weak and emaciated to make him carry two buckets of lead instead of one. (Kawakita v. United States, supra, 343 U.S. at pp. 737-738, 72 S.Ct. 950.) In yet another, he ordered a POW to carry a heavy log up an ice-covered slope. When the prisoner fell, Kawakita delayed his removal back to the POW camp for five hours. (Id. at p. 740, 72 S.Ct. 950.) There were another five such instances of cruel treatment of American POWs as slave laborers.
The Supreme Court upheld the treason conviction because these were acts that "gave aid and comfort to the enemy." (Kawakita, supra, 343 U.S. at p. 741, 72 S.Ct. 950.) As the high court said, "They showed conduct which actually promoted the cause of the enemy. They were acts which tended to strengthen the enemy and advance its interests. These acts in their setting would help make all the prisoners fearful, docile, and subservient.... These acts would tend to give the enemy the `heart and courage to go on with the war.' ... All of the overt acts tended to strengthen Japan's war efforts; all of them encouraged the enemy and advanced its interests." (Id. at pp. 741-742, 72 S.Ct. 950.)[23]
*747 If the maltreatment of American POWs by a civilian employee of a civilian company was sufficient aid and comfort to the Japanese during wartime that it constituted treason if committed by an American citizen, there can be no denying that the plaintiffs' claims herewhich are, in a horrible sense, the same facts as the Kawakita case except viewed from the vantage of the American prisoners, not one of their tormentorsarose "in the course of the prosecution of the war" for purposes of the treaty.
The most natural reading of the "prosecution" is thus one which is not limited to merely lawful acts. Claims, after all, almost always arise out of unlawful or wrongful acts.

C
Next there is the matter of the difference in language between Article 14 (where the Allies waived claims) and Article 19 (where the Japanese waived claims). As the plaintiffs correctly point out here, Article 19 is broader. Article 19(a) of the treaty provides: "Japan waives all claims of Japan and its nationals against the Allied Powers and their nationals arising out of the war or out of actions taken because of the existence of a state of war, and waives all claims arising from the presence, operations or actions of forces or authorities of any of the Allied Powers in Japanese territory prior to the coming into force of the present Treaty." (Peace Treaty, supra, 3 U.S.T. at p. 3187.)
Moreover, in explaining what is encompassed by the waiver provisions of the article's first paragraph, Article 19(b) makes an explicit reference to the claims of Japanese POWs. "The foregoing waiver includes any claims arising out of actions taken by any of the Allied Powers with respect to Japanese ships between September 1, 1939, and the coming into force of the present Treaty, as well as any claims and debts arising in respect to Japanese prisoners of war and civilian internees in the hands of the Allied Powers, but does not include Japanese claims specifically recognized in the laws of any Allied Power enacted since September 2, 1945." (Peace Treaty, supra, 3 U.S.T. at p. 3187.) The plaintiffs lay heavy emphasis on the fact that Article 19 contains a specific reference to Japanese POWs whereas its counterpart, Article 14, doesn't contain a specific reference to Allied POWs.
It is an argument that has force, and is supported by the venerable legal principle that in specifically mentioning one thing you impliedly exclude another. (Expressio unius est exclusio alterius.)
*748 On balance, however, it cannot carry the day in light of the text of Article 16, specifically dealing with Allied POWs, and the basic facts in the historical record we have already mentioned. The specific provisions for Allied prisoners of war in Article 16 of the treaty would lead one to the natural conclusion that the fund being set up in that article was intended to serve as the main source of compensation for them. Any doubt is removed in the Senate Foreign Relations Committee report and the clear expression of intent in Article 14(a) to protect the viability of the Japanese economy.
Remember that in 1951 there was no California statute yet limiting the value of American prisoner of war claims to just the value of their forced labor. They clearly had tort claims for battery, torture, and intentional infliction of emotional distress of the worst sort. These are tort claims easily justifying punitive damages which could have resulted in the bankruptcy of the Japanese companies involved. We need only contemplate the enormity of the sacrifices of the plaintiffs in this case to recognize what would have happened if an American jury had one of the Japanese corporate defendants in front of it and was not limited to just the value of the forced labor. What had the Senate Foreign Relations Committee report said? Insistence on paying reparations "in any proportion commensurate" the claims would wreck Japan's economy.
Thus particularly given how horribly the plaintiffs in this case were treated, it must be assumed that the United States government knew that properly compensating them would be economically impossible. The strong indicia of intent to protect the Japanese economy as expressed by the key players on the American side must necessarily carry more weight than the asymmetry between Articles 14 and 19, which, we must acknowledge, cuts the other way.

D
Finally, plaintiffs contend that Article 26, which can be described as the "most favored nation" clause, allows them to maintain their claims. Article 26 says: "Japan will be prepared to conclude with any State which signed or adhered to the United Nations Declaration of January 1, 1942, and which is at war with Japan, or with any State which previously formed a part of the territory of a State named in Article 23, which is not a signatory of the present Treaty, a bilateral Treaty of Peace on the same or substantially the same terms as are provided for in the present Treaty, but this obligation on the part of Japan will expire three years after the first coming into force of the present Treaty. Should Japan make a peace settlement or war claims settlement with any State granting that State greater advantages than those provided by the present Treaty, those same advantages shall be extended to the parties to the present Treaty." (Peace Treaty, supra, at p. 3190.)
Preliminarily, we must note that the most favored nation argument based on Article 26 tacitly acknowledges that Article 14 would otherwise preclude the lawsuit. The most favored nation argument only makes sense if you first say that, yes, the United States didn't get as good a deal under the terms of the treaty as some other nation got outside the treaty.
The allegation is that because so many of its citizens had lost property when the Japanese invaded Dutch Indonesia, the government of the Netherlands would not have signed the peace treaty with Japan unless it got a side deal with Japan for *749 some compensation to those citizens.[24] The side deal involved the government of Japan paying private Dutch citizens (Allied "nationals" under the terms of Article 14) about $10 million in reparations.
The most favored nation argument fails because, by its terms, Article 26 creates no private rights. The key phrase is "those same advantages shall be extended to the parties to the present Treaty." Individual American citizens are not a party to the treaty, only the United States is. (See Matta-Ballesteros v. Henman (7th Cir. 1990) 896 F.2d 255, 259 ["`it is up to the offended nations to determine whether a violation of sovereign interests occurred and requires redress'"].) Thus even if we assume private Dutch citizens got compensation from the Japanese government where American POWs hadn't, it was the responsibility of the American government to enforce the article by making the Japanese government pay something to them. There is nothing in Article 26 that makes it self-executing. Rather, it requires one of the "parties" to enforce it.
There are other fatal flaws in the most favored nation argument as well. Even if the United States were to obtain as favorable a side deal as the Dutch allegedly got, what would that be? Only direct reparations from the government of Japan, which is not the subject of this litigation. There is no indication that private Dutch citizens were allowed to sue private Japanese companies in Dutch court for loss of property.

IV
Much of the briefing in this case has focused on an issue of whether in enacting Code of Civil Procedure section 354.6 the California Legislature unconstitutionally infringed on the executive powers of the federal government. (See generally Zschernig v. Miller (1968) 389 U.S. 429, 88 S.Ct. 664, 19 L.Ed.2d 683 [Oregon probate statute that required state courts to determine whether the American heirs of an alien would have a reciprocal right to inherit in alien's country held unconstitutional because it had more than an incidental effect on foreign relations].)[25]
Both the federal district court in In re World War II Era Japanese Forced Labor Litigation (N.D.Cal.2001) 164 F.Supp.2d 1160 and the (as yet not final) Ninth Circuit decision in Deutsch v. Turner Corporation, supra, 324 F.3d 692 dealt with that problem, in part because those cases involved claims brought pursuant to section 354.6 by mow-Allied nationals, which weren't waived by the treaty. Each federal court decided that our state statute did impermissibly infringe on the federal government's foreign policy power.
We do not need to reach that issue. It is enough to note that the treaty, taken as a whole in historical context, precludes this lawsuit.
We are therefore required to let a peremptory writ issue commanding the Superior Court to vacate its orders overruling the demurrers and denying the motions for judgment on the pleadings in these *750 cases, and enter a new and different order dismissing the cases.
In the interests of justice each side will bear its own costs.
We Concur: RYLAARSDAM and O'LEARY, JJ.
NOTES
[1] Subdivision (b) of Code of Civil Procedure section 354.6 provides in pertinent part: "Any Second World War slave labor victim ... may bring an action to recover compensation for labor performed as a Second World War slave labor victim ... from any entity or successor in interest thereof, for whom that labor was performed, either directly or through a subsidiary or affiliate." The language obviously does more than deal with the statute of limitations on existing claims; it clearly creates a claim where one might not otherwise have existed. (All further statutory references in this opinion are to the Code of Civil Procedure, and specifically to section 354.6 of that code.)
[2] The statute was enacted in 1999. Structurally, subdivision (b) of section 354.6 (see footnote 1, above) creates the claim, while subdivision (c) makes clear that the statute of limitations does not run on it until 2010. Subdivision (c) provides: "Any action brought under this section shall not be dismissed for failure to comply with the applicable statute of limitation, if the action is commenced on or before December 31, 2010." In this opinion we need not deal with the question of whether the state Legislature, consistent with the due process clauses of the state and federal Constitutions, can revive state tort claims (e.g., battery) that had long ago expired under their applicable statute of limitations.
[3] A recent, and as of this writing, nonfinal decision of another panel of the California Court of Appeal, Taiheiyo Cement Corporation v. Superior Court (2003) 105 Cal.App.4th 398, 129 Cal.Rptr.2d 451, deals with the claims of a Korean national who was subjected to slave labor in World War II. The plaintiff in that litigation, Jae Won Jeong, subsequently became an American citizen and is now suing, under section 354.6, the cement company for whom he was forced to work. The Taiheiyo Cement court ruled, among other things, that section 354.6 was not an unconstitutional infringement on the foreign affairs power of the federal government and said that the plaintiff could continue his lawsuit.

Then even more recently, the federal Ninth Circuit issued an opinion which did deal with the claims of American POWs who were forced to do slave labor in World War II, Deutsch v. Turner Corporation (9th Cir.2003) 324 F.3d 692. However, in direct contrast to the Second District's Taiheiyo Cement decision, the Deutsch case held that section 354.6 was an unconstitutional infringement by the state government of California on the federal government's foreign affairs power.
Our decision today avoids the Taiheiyo Cement-Deutsch conflict. Because we base our ruling on the scope of the 1951 treaty, there is no need to address the question of whether section 354.6 does, or does not, impermissibly infringe on the federal government's foreign affairs power absent direct preclusion of a plaintiff's claims by treaty. For us, it is enough to note that the 1951 treaty is dispositive as to the claims of American nationals against Japanese companies. Because Korea was not a signatory to the 1951 peace treaty between the United States and Japan, there is no need to address the merits of that decision, though the Taiheiyo Cement court made one observation in a footnote about the 1951 treaty which we consider in footnote 22.
[4] The plaintiffs have helpfully provided the record of the hearings of the United States Senate Judiciary Committee entitled "Former U.S. World War II POWs: A Struggle for Justice" dated June 28, 2000 (see Hearing before Sen. Com. on Judiciary, 106th Cong., 2d Sess. (2000) (hereafter "Senate Report")). The Senate Report contains the testimony of a number of the surviving POWs. We take judicial notice of this report.
[5] See, e.g.. Senate Report, supra, at p. 30 (prepared statement of Harold W. Poole).
[6] As many as 21 unmarked merchant ships transporting American POWs were torpedoed. (See Linda G. Holmes, Unjust Enrichment: How Japan's Companies Built Postwar Fortunes Using American Pows (2001) at p. 33 (hereafter "Unjust Enrichment").)
[7] More graphic descriptions of conditions aboard the hell ships may be found in Chapter 4 of Unjust Enrichment, aptly entitled "Voyages in Hell." (See Unjust Enrichment, supra, at pp. 33-43.)
[8] See Unjust Enrichment, supra, at p. 25 ("It would have been hard to find a POW company worksite in Japan during World War II that was not directly related to war production.") (original emphasis). This was in direct contravention of Article 31 of the 1929 Geneva Convention, which states that POW work "shall have no direct connection with the operations of the war." Holmes captures the extreme psychological oppression in the practice, quoting former POW Robert O'Brien: "`You can't imagine what it was like, each day, being made to manufacture weapons of war to be used against your own brothers!'" (Unjust Enrichment, supra, at p. 27.)
[9] See Senate Report, supra, at p. 31 (statement of Frank Bigelow). The pattern of being delivered by the Japanese Army every morning to a private company to work was repeated in the statement of Bataan Death March survivor Maurice Mazer: "I was imprisoned in Hanawa Camp in Japan. Each morning, the Japanese soldiers turned me and my fellow prisoners of war over to the guards for Mitsubishi Mining, a private company which enslaved us for its own profit and forced us to work in its copper mines and smelter mines." (Senate Report, supra, at p. 32.)
[10] Senate Report, supra, at p. 34 (statement of former POW Lester I. Tenney).
[11] See Herbert P. Bix, Hirohito and the Making of Modern Japan (2000) at p. 360.
[12] See Anita Ramasastry, Corporate Complicity: From Nuremberg to Rangoon: An Examination of Forced Labor Cases and Their Impact on the Liability of Multinational Corporations (2002) 20 Berkeley J. Int.'l. L. 91, 113-117.
[13] Senate Report, supra, at p. 50 (responding to questions posed by Senator Hatch).
[14] Senate Report, supra, at p. 50 (responding to question posed by Senator Hatch) (`Following the war, these assets were seized by the Office of Alien Property (an office within the U.S. Department of Justice), liquidated, and the proceeds placed into a War Claims Fund, for ultimate distribution to POWs and other claimants.'). See also id. at p. 40 (prepared statement of Professor Maier quoting John Foster Dulles to the effect that approximately $20 million of the $90 million had already been used for claims approved by Congress on behalf of internees, civilians and prisoners of war, and it remained for Congress to decide what it wanted to do with the balance).
[15] Senate Report, supra, at p. 2 (statement of Chairman Hatch). See also Unjust Enrichment, supra, at p. 138 (`It is true that Japanese assets frozen in the United States at the outbreak of the war were used to pay military ex-POWs under the War Claims Acts of 1948 and 1952, but the POWs maintain that $1 a day for "missed meals" hardly made up for the life-long effects of malnutrition, and $1.50 "For each day they were forced to perform labor and/or were subjected to inhumane treatment" was not sufficient.') (Footnote omitted).
[16] Dulles was Time Magazine's Man of the Year for 1954.
[17] Recently the idea has come under fire (see Margaret MacMillan, Paris 1919: Six Months That Changed the World (Random House 2001) at p. 493 (arguing that to assign blame to the second world war "is to ignore the actions of everyonepolitical leaders, diplomats, soldiers, ordinary votersfor twenty years between 1919 and 1939").) Even MacMillan, however, recognizes the role Versailles played as a conventional explanation for World War II. (See ibid. ("Later it became commonplace to blame everything that went wrong in the 1920s and 1930s on the peacemakers and the settlements they made in Paris in 1919....").) And there is no doubt that the terms of the Versailles treaty had been exploited by Hitler for propaganda reasons. (See ibid. ("Hitler did not wage war because of the Treaty of Versailles, although he found its existence a godsend for his propaganda").) The conventional view that Versailles directly led to World War II is probably still regnant. (See, e.g., ibid, (quoting the special millennium issue of the Economist magazine to the effect that "`The final crime'" was "`the Treaty of Versailles, whose harsh terms would ensure a second war'"); Roger P. Alford, On War As Hell (2002) 3 Chi. J. Internat. Law 207, 210 ("The consequences of the Treaty of Versailles were devastating for Germany. Germany agreed to pay reparations for all damage caused by the war, amounting to over $30 billion.....[¶] Many Germans greatly objected to the War Guilt clause and resented the onerous reparations they were forced to pay as a result of the Treaty of Versailles.... The seeds of discontent were sown at Versailles and bore devastating fruit in the Second World War").)
[18] A point made with some force in a New York Times article cited to us by the plaintiffs and obtained from the internet, Steven C. Clemons, Recovering Japan's Wartime Past and Ours (September 4, 2001) New York Times. ("Dulles had been a United States counsellor at the Paris Peace Conference in 1919, with special responsibility for reparations. He had opposed, without much success, the heavy penalties imposed by the Allies on Germany. These payments were widely seen as responsible for the later collapse of Germany's economy and, if obliquely, for the rise of Nazism. After World War II, Dulles feared that heavy reparations burdens would similarly cripple Japan, make it vulnerable to Communist domination and prevent it from rebuilding. It was crucial to Dulles that Japan not face claims arising from its wartime conduct."). See also MacMillan, Paris 1919: Six Months That Changed the World, supra, at p. 467 ("And so Article 231, a clause that the young John Foster Dulles helped to draft as a compromise over reparations, became the great symbol of the unfairness and injustice of the Treaty of Versailles in Weimar Germany, in much subsequent historyand in the English-speaking world").

The New York Times piece hardly contains any revelations about Dulles. He had long been on record as opposing reparations, having written an article for the May 1921 issue of Foreign Affairs, "How Reparation Defeats Itself."
[19] The standard source in English for the decision is a secondary one, Richard A. Falk, The Shimoda Case: A Legal Appraisal of the Atomic Attacks Upon Hiroshima and Nagasaki (1965) 59 Am. J. Internat. L. 759 (hereinafter "Falk"). While the (hard to find) Japanese Annual of International Law for 1964 provides a full English translation of the opinion, a translation was obtained from the internet.
[20] See Harry S. Truman, Radio Report to the American People on the Potsdam Conference (Aug. 9, 1945), in 1945 Public Papers at p. 212, quoted in Winston P. Nagan, Nuclear Arsenals, International Lawyers, and the Challenge of the Millennium (1999) 24 Yale J. Int'l. L. 485, 535, fn. 43.
[21] Indeed, the commencement of a similar case in federal court has prompted one commentator to note that allowing domestic law claims by former American POWs threatens the good relations that the 1951 treaty was intended to promote. (See Nicholas P. Van Deven, Taking One for the Team: Principle of Treaty Adherence as a Social Imperative for Preserving Globalization and International Legal Legitimacy as Upheld in In re World War II Era Japanese Forced Labor Litigation (2002) 46 St. Louis U. L.J. 1091, 1122-1123 ["Throughout the suit, many plaintiffs went on record as saying that they desired to have their day in court for purposes of revealing the details of wartime offenses committed against American soldiers in the Pacific.... The Japanese responded to these observations by exclaiming that these claims were a `form of extortion' and that if the United States desired to do so, the gloves essentially would come off. In an effort to combat the claims and show that America was not without guilt in the Second World War, Japanese officials voiced a desire to surface the questionable usage of atomic warfare in both Hiroshima and Nagasaki. Arguably, tensions would have soared had the World War II Case gone before a jury. [¶] Dulles feared that allowing such suits to prevail would hinder progressive international relations with Japan. These quotes made by Japanese officials demonstrate that the fears of Dulles came close to being true." (Footnotes omitted.)].)
[22] It was on the basis of that conclusion that the Taiheiyo Cement court observed, in footnote 7 of its decision, that it was "reasonable to interpret this clause [article 14(b) ] to exclude actions taken by private Japanese companies for profit as not being actions taken in the `course of the prosecution of the war.'" (Taiheiyo Cement, supra, 105 Cal.App.4th at p. 410, fn. 7, 129 Cal.Rptr.2d 451 quoting Bazyler. The Holocaust Restitution Movement in Comparative Perspective (2002) 20 Berkeley J. Int.'l Law 11, 30, citing Kawakita, supra, 343 U.S. at pp. 727-728.) The observation is obviously obiter dictumbecause the Taiheiyo Cement case did not involve American citizens, the court had no need to address the question of whether the use of slave labor by private Japanese companies was within the purview of the 1951 treaty. That said, we respectfully disagree with the import of the footnote. As we are about to explain in the text above, it is erroneous to draw the conclusion from the Kawakita court's rejection of the defendant's "private employment" defense that the Japanese companies exploiting slave labor weren't part of the "prosecution" of the war. They most certainly were. To conclude otherwise is to ignore the fact that Kawakita himself was still convicted of treason, precisely because his work for a private company gave aid and comfort to the enemy during wartime.
[23] Interestingly enough, the question of where the conduct of the Japanese military left off and where that of private companies began was also the central concern of the British Military court that tried the executives of the Nippon Mining Company in 1947. One of the defenses asserted in that case was that the private company was acting under orders from the Japanese Army. (See Anita Ramasastry, Corporate Complicity: From Nuremberg to Rangoon: An Examination of Forced Labor Cases and Their Impact on the Liability of Multinational Corporations, supra, 20 Berkeley J. Internat. L. at p. 114 ("the British Military court focused a great deal of attention on whether care for the prisoners (and subsequent mistreatment) was the responsibility of the mining company or of the army. Similar to the German industrialists, the mining company officials invoked the defense of necessity. They asserted that in using POW labor in their mining operations, they were acting under orders from the Japanese Army.").) As was the case with American POWs, the typical pattern was that guards would march POWs to the entrance of a mine, where the prisoners would be handed over to civilians. (See id. at pp. 115-116.)

In this regard, we also, at plaintiffs' request, take judicial notice of the recent decision by the Fukuoka District Court on April 26, 2002, entitled Jang Bao Heng v. Mitsui Mining, Inc., a case involving surviving Chinese prisoners of war. (We fully recognize the limitations of the reportit is the plaintiffs' translation of the decision, and it is of limited relevance to a case involving American Prisoners of War in any event. Even so, there is no reason to ignore the decision.)
Much of the Jang Bao Heng opinion appears to be devoted to demonstrating that the claims of Chinese nationals against Japanese nationals were not renounced in the Sino-Japanese Joint Statement of 1972 and the 1978 Sino-Japanese treaty of friendship and peace and is thus technically irrelevant to the case before us here. The primary significance of the case to the plaintiffs are statements in its translated decision to the effect that "Defendant Country should not bear responsibility for compensation for injuries based on these [the mining companies'] illegal acts" and "[I]t cannot be said that the workplace facilities, etc., were established under the control of, or that Plaintiffs' working conditions, etc. were managed, according to Defendant Country." The inference we are asked to draw is that the actions of these private companies should not be ascribed to the Japanese war effort. Not so. The court decision (at least the translation of it provided by plaintiffs' counsel) is very plain that the use of slave labor by Japanese countries during the war was part of the Japanese war effort. Consider these passages: From page 5 (making the point that the Chinese and POW slave laborers were released at the end of the war): "Depending on the method of administrative delivery, for the purpose of making up for the labor shortage accompanying the prosecution of the war in the Pacific, Defendants collaborated and, just as the Chinese laborers, including Plaintiffs, were forcibly taken away and forcibly made to work against their wishes, Japan was defeated and, because the Japanese government signed the instrument of surrender on September 2, J 945, the aim of the forced taking away and forced labor in this case was extinguished." (Emphasis added.) And from page 6: "In this case, regarding the forced taking away and forced labor in this case, Defendant Country expected that it would be solved as war crimes case. ..." (Emphasis added.)
[24] See Steven C. Clemons, Recovering Japan's Wartime Pastand Ours (September 4, 2001) New York Times, copy obtained from the internet.
[25] A side issue in the case is the effect of Gerling Global Reinsurance Corp. of America v. Low (9th Cir.2001) 240 F.3d 739, a case dealing with certain California insurance regulations making it easier for Holocaust victims to assert insurance claims. Gerling has no application to this case. It is one thing for California to require an insurer doing business in this state to disclose certain information, quite another to create a claim that arises directly out of an enemy's war efforts against the United States.