129 Cal.Rptr.2d 451 (2003)
105 Cal.App.4th 398
TAIHEIYO CEMENT CORPORATION et al., Petitioners,
v.
The SUPERIOR COURT of the State of California for the County of Los Angeles, Respondent.
Jae Won Jeong, Real Party in Interest.
No. B155736.
Court of Appeal, Second District, Division Eight.
January 15, 2003.
Rehearing Denied February 11, 2003.
Review Granted April 30, 2003.
*454 Bingham Dana, Matthew E. Digby, Heidi A. Leider; Bingham McCutchen, Matthew E. Digby, Heidi A. Leider, Los Angeles; Masuda & Ejiri and Junji Masuda; Loeb & Loeb, Douglas E. Mirell, Joseph Geisman, Century City; Greines, Martin, Stein & Richland, Martin Stein, Robin Meadow and Laura Boudreau, Los Angeles, for Petitioners Taiheiyo Cement Corporation, Taiheiyo Cement U.S.A., Inc., California Portland Cement Company and Glacier Northwest, Inc.
O'Melveny & Myers and John F. Niblock, Wash., Dist. of Columbia; McCutchen, Doyle, Brown & Enersen and David M. Balabanian, Boston, MA; Morrison & Foerster, Lloyd Aubry and Arne D. Wagner, San Francisco; Pillsbury Winthrop and Barbara Croutch; Bingham Dana and Matthew Digby; Bingham McCutchen and Matthew Digby; Sullivan & Cromwell and Robert A. Sacks, Los Angeles, for Mitsubishi Materials Corp., Mitsubishi Materials U.S.A. Corp., Mitsui & Co., Ltd., Mitsui & Co. (U.S.A.), Inc., Mitsubishi International Corp., Ishikawajima Harima Heavy Industries Co., Ltd., IHI, Inc., Mitsubishi Heavy Industries, Ltd., Mitsubishi Heavy Industries America, Inc., Mitsui Mining Co., Ltd., Mitsui Mining U.S.A., Inc., Nippon Steel Corporation, Nippon Steel U.S.A., Inc., Nippon Steel Trading Co., Ltd., and Nippon Steel Trading America, Inc., as Amici Curiae on behalf of Petitioners.
John S. Gordon, United States Attorney; Robert D. McCallum, Jr., Assistant Attorney General; James G. Hergen and Lara A. Ballard, United States Department of State; Mark Stern, Douglas Hallward-Driemeier and Kathleen Kane, United States Department of Justice, for the United States of America as Amicus Curiae on behalf of Petitioners.
Fleishman & Fisher, Barry A. Fisher, Los Angeles, David Grosz; Lieff, Cabraser, Heimann & Bernstein, Elizabeth J. Cabraser, Morris A. Ratner, San Francisco, Bill Lann Lee, Los Angeles, Scott P. Nealy; Blumenthal & Markham and David R. Markham, San Diego; Law Offices of Haewon Shin and Haewon Shin; Cohen, Milstein, Hausfeld & Toll, Michael D. Hausfeld, Wash., Dist. of Columbia, Agnieszka M. Fryszman; Kenneth T. Haan & Associates and Kenneth T. Haan; Lim, Ruger & Kim, Christopher Kim, Los Angeles, and Lisa J. Yang, for Real Party in Interest Jae Won Jeong.
Strumwasser & Woocher and Fredric D. Woocher, Santa Monica; Jack Goldsmith and Erwin Chemerinsky, for the Chinese American Citizens Alliance, the Korean-American Federation of Los Angeles, the *455 Korean American Coalition, and the Korean American Chamber of Commerce of Los Angeles as Amici Curiae on behalf of Real Party in Interest.
Schonbrun, DeSimone, Seplow, Harris & Hoffman, Venice, and Paul L. Hoffman, for the Honorable John L. Burton, Herbert J. Wesson, Jr., Tom Hayden, Adam B. Schiff, Gil Cedillo, Wilma Chan, Dr. Judy Chu, Mike Honda, Carol Liu, and George Nakano, as Amici Curiae on behalf of Real Party in Interest.
Bill Lockyer, Attorney General for the State of California, Richard M. Frank, Chief Assistant Attorney General, Louis Verdugo, Jr., Senior Assistant Attorney General, Catherine Z. Ysrael, Supervising Deputy Attorney General, and Phyllis Cheng, Deputy Attorney General, for Attorney General Bill Lockyer as Amicus Curiae on behalf of Real Party in Interest.
BOLAND, J.

INTRODUCTION
Code of Civil Procedure section 354.6[1] allows certain individuals who were "slave labor" or "forced labor" victims during World War II (WWII) to recover compensation for unpaid labor and personal injuries suffered during that time period. In this case, we decide whether an international treaty preempts section 354.6 and whether the statute is unconstitutional because it impermissibly infringes upon the federal government's exclusive power over foreign affairs. We also decide whether section 354.6 is unconstitutional because it violates due process by allowing claims that arose long ago outside California. We hold the statute is neither preempted nor unconstitutional. Rather, it validly extends the applicable statute of limitations that would otherwise bar claims for unpaid labor and personal injuries suffered by slave or forced labor victims.

FACTUAL ALLEGATIONS AND PROCEDURAL BACKGROUND
Jae Won Jeong sued to recover compensation for unpaid labor and personal injuries suffered while enslaved in a labor camp during WWII. Jeong, who is now a United States citizen and California resident, claims he was a Korean national during WWII. Refusing to join the Japanese military, Jeong was taken to a slave labor camp in Korea operated by a Japanese cement company. Along with other Korean nationals, Jeong was subjected to physical and mental torture and forced to perform hard physical labor without compensation, all to benefit the Japanese war effort.[2]
Onoda Cement Co., Ltd. is the Japanese entity that operated the company where Jeong was forced to work. Jeong sued Onoda, Taiheiyo Cement Corporation (the Japanese entity that succeeded Onoda by merger), and three of Taiheiyo's subsidiaries, all of which are referred to as "Taiheiyo."[3] Jeong alleged causes of action for (1) compensation under section 354.6, (2) unjust enrichment, (3) injuries in tort, including battery, intentional infliction of *456 emotional distress, and unlawful imprisonment, and (4) unfair business practices under Business and Professions Code section 17200 et seq.
Taiheiyo moved for judgment on the pleadings contending, among other grounds, that Jeong's claims were barred by the 1951 Treaty of Peace with Japan (1951 Treaty) and the 1965 Agreement between Japan and Korea. The trial court denied the motion, concluding (1) the 1951 Treaty did not apply to Korean nationals like Jeong because Korea was not a signatory to the treaty, (2) the 1965 Agreement between Japan and Korea did not preempt state law or bar Jeong's claims, and (3) no other federal law expressly or impliedly preempted section 354.6.
After the trial court denied Taiheiyo's motion, a federal district court decided a similar case brought under section 354.6 and concluded the statute was unconstitutional under the foreign affairs doctrine announced by the United States Supreme Court in Zschernig v. Miller (1968) 389 U.S. 429, 88 S.Ct. 664, 19 L.Ed.2d 683 (Zschernig). The district court ruled section 354.6 interfered with the federal government's exclusive power over foreign affairs and was unconstitutional. (See In re: World War II Era Japanese Forced Labor (N.D.Cal.2001) 164 F.Supp.2d 1160, 1173 (Forced Labor Litigation).) As a result of the district court's decision, Taiheiyo filed a second motion for judgment on the pleadings asserting the same constitutional argument. In addition, Taiheiyo argued section 354.6 violated due process by reaching claims that arose in a foreign country over 50 years ago.
The trial court again denied Taiheiyo's motion. It disagreed with the federal court's application of Zschernig and concluded section 354.6 had no direct impact on foreign relations. The trial court also ruled section 354.6 did not violate due process, but rather legitimately extended statute of limitations that would otherwise bar claims by slave or forced labor victims. This petition followed.

BASIS FOR WRIT REVIEW
In most cases, a review of rulings on pleadings is restricted to an appeal from a final judgment unless circumstances are "of such grave nature or of such significant legal impact that [the court is] compelled to intervene through the issuance of an extraordinary writ." (Babb v. Superior Court (1971) 3 Cal.3d 841, 851, 92 Cal.Rptr. 179, 479 P.2d 379.)
We agreed to review this case at the pleading stage because the constitutionality of section 354.6 represents a legal issue of widespread interest and significant legal importance. (See Brandt v. Superior Court (1985) 37 Cal.3d 813, 816, 210 Cal. Rptr. 211, 693 P.2d 796; Omaha Indemnity Co. v. Superior Court (1989) 209 Cal. App.3d 1266, 1269-1270, 258 Cal.Rptr. 66.) In addition, because numerous cases asserting claims under section 354.6 are currently pending in the superior court and no California appellate court has yet ruled on the validity of this statute, we concluded writ review was warranted and authorized numerous amici curiae to present briefs in support of and in opposition to the petition.
Because this case involves pure questions of law, we are not bound by the trial court's decision. We therefore review it de novo, mindful that Jeong's factual allegations are assumed true. (People v. Kennedy (2001) 91 Cal.App.4th 288, 292, 110 Cal.Rptr.2d 203; Baughman v. State of California (1995) 38 Cal.App.4th 182, 187, 45 Cal.Rptr.2d 82.)

*457 DISCUSSION

A. Section 354.6 and Taiheiyo's Contentions
The California Legislature enacted section 354.6 in 1999 as an emergency measure to extend the statute of limitations for a defined class of claims relating to forced or slave labor performed prior to and during WWII. (S.B.1245.) The statute allows any WWII "slave labor victim" or "forced labor victim," or their heirs, to "bring an action to recover compensation for labor performed as a . . . slave labor victim or . . . forced labor victim from any entity or successor in interest thereof, for whom that labor was performed . . .." (§ 354.6, subd. (b).) The statute provides that California courts have jurisdiction over such actions. (Ibid.)[4] Section 354.6 was enacted because "California has a moral and public policy interest in assuring that its residents and citizens are given a reasonable opportunity to claim their entitlement to compensation for forced or slave labor performed prior to and during the Second World War." (S.B.1245, § 1(c).)
Section 354.6, subdivision (c), provides that "[a]ny action brought under this section shall not be dismissed for failure to comply with the applicable statute of limitations, if the action is commenced on or before December 31, 2010." In declaring its specific intent, the Legislature added, "To the extent that the statute of limitations applicable to claims for compensation is extended by this act, that extension of the limitations period is intended to be applied retroactively, irrespective of whether the claims were otherwise barred by any applicable statute of limitations under any other provision of law prior to the enactment of this act." (S.B.1245, § 1(d).)
Taiheiyo and amici curiae in support of the petition make four basic contentions concerning the invalidity of section 354.6. First, the 1951 Treaty either expressly or impliedly preempts section 354.6 because it demonstrates the policy of the federal government concerning WWII claims of Korean nationals like Jeong. Second, section 354.6 is unconstitutional under Zschernig because it usurps the federal government's exclusive power over foreign affairs. Third, section 354.6 violates due process by allowing claims that arose a half-century ago outside California. And fourth, *458 Jeong's claims present nonjusticiable political questions. As we will explain, we reject these arguments.

B. Preemption and the 1951 Treaty

1. Express Preemption
Express preemption, as the term suggests, requires an affirmative declaration by Congress that federal law prohibits state regulation. (Metropolitan Life Ins. Co. v. Massachusetts (1985) 471 U.S. 724, 738, 105 S.Ct. 2380, 85 L.Ed.2d 728; Cipollone v. Liggett Group, Inc. (1992) 505 U.S. 504, 516-518, 112 S.Ct. 2608, 120 L.Ed.2d 407; see also Tafflin v. Levitt (1990) 493 U.S. 455, 466, 110 S.Ct. 792, 107 L.Ed.2d 887 [it is presumed Congress ordinarily does not intend to displace existing state authority].)
The U.S. Constitution mandates that treaties made "under the Authority of the United States, shall be the supreme Law of the Land," thus overriding any conflicting state law. (U.S. Const., art. VI; see Missouri v. Holland (1920) 252 U.S. 416, 432, 40 S.Ct. 382, 64 L.Ed. 641; United States v. Belmont (1937) 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134, Zicherman v. Korean Air Lines Co. (1996) 516 U.S. 217, 226, 116 S.Ct. 629, 133 L.Ed.2d 596.) In determining whether a treaty overrides state law, "it is our responsibility to give the specific words of the treaty a meaning consistent with the shared expectations of the contracting parties." (Air France v. Saks (1985) 470 U.S. 392, 399, 105 S.Ct. 1338, 84 L.Ed.2d 289.)
The 1951 Treaty "was signed at San Francisco . . . by the representatives of the United States and 47 other Allied powers and Japan. [Citation]. President Truman, with the advice and consent of the Senate, ratified the treaty and it became effective April 28, 1952. [Citation.] [¶] . . . [T]he salient features of the agreement are: (1) a grant of authority of Allied powers to seize Japanese property within their jurisdiction at the time of the treaty's effective date; (2) an obligation of Japan to assist in the rebuilding of territory occupied by Japanese forces during the war[,] and (3) waiver of all `other claims of the Allied Powers and their nationals arising out of any actions taken by Japan and its nationals in the course of the prosecution of the war. . ..' [Citation.]" (In re World War II Era Japanese Forced Labor (N.D.Cal.2000) 114 F.Supp.2d 939, 944-945, italics omitted.) Neither Korea nor China was a signatory to the 1951 Treaty. (Forced Labor Litigation, supra, 164 F.Supp.2d at pp. 1167-1168.)
Taiheiyo and the United States as amicus curiae argue the waiver provision of Article 14(b) of the 1951 Treaty expressly preempts Korean nationals like Jeong from asserting claims under section 354.6. The provision reads: "(b) Except as otherwise provided in the present Treaty, the Allied Powers waive all reparations claims of the Allied Powers, other claims of the Allied Powers and their nationals arising out of any actions taken by Japan and its nationals in the course of the prosecution of the war, and claims of the Allied Powers for direct military costs of occupation." (Treaty of Peace With Japan, Sept. 8, 1951, 3 U.S.T. 3169, 3183, T.I.A.S. No. 2490.)
Nothing in this or any other provision of the 1951 Treaty expressly preempts or bars claims by Korean nationals against Japanese corporations for unpaid labor or personal injuries suffered for slave or forced labor during WWII. To the contrary, the treaty recognized the waiver provision of Article 14 was to have no effect on the claims of non-signatory nations.
The 1951 Treaty did not address claims between Korean and Japanese nationals *459 because the Allied Powers had no authority to bind Korea, which was not a signatory nation to the Treaty. The 1951 Treaty, however, provides that claims between Korean and Japanese nationals were to be the subject of separate arrangements between the two countries. Specifically, Article 4(a), which addressed Japan's postwar relationship with Korea, provides that "the disposition of property of Japan and of its nationals . . . and their claims, including debts, against [Korea] . . ., and the disposition in Japan of property of [Korean] authorities and residents, and of claims, including debts, of [Korean] authorities and residents against Japan and its nationals, shall be the subject of special arrangements between Japan and such authorities." (1951 Treaty, supra, 3 U.S.T. at p. 3173.)
Korea benefited from Article 4(a)'s requirement that Japan enter into future negotiations concerning the resolution of war claims.[5] However, neither Japan nor Korea was required to implement any specific resolution. Indeed, Korea was under no obligation to even negotiate with Japan concerning the settlement of war claims. Further, another treaty provision required Japan, as part of any future arrangements with non-signatory nations, to provide them "the same or substantially the same terms" as to the signatory nations. However, even that obligation, binding only on Japan, expired after three years.[6]
In sum, the 1951 Treaty did not bar future claims by individuals of non-signatory nations and does not expressly preempt section 354.6. We therefore agree with the conclusions of Forced Labor Litigation that Article 4(a) "suggest[s] that the treaty contemplates resolution of war claims with Korea . . . through agreements separate and distinct from the [1951 Treaty] and separate agreements necessarily create the possibility that the terms for resolving those claims may differ from the terms of the treaty entered into by the Allied nations. The fact that the signatory nations encouraged such agreements does not show an intent to occupy the field of nonsignatory nations' claims through the treaty. . .. Whether the agreements subsequently entered by Japan with Korea . . . eliminated the claims of [this] non-signatory nation[ ] does not bear on whether the [1951 Treaty] preempts claims of . . . Korean nationals. The court reads the language of article[ ] 4(a) . . . to suggest only that the signatory nations, including the federal government of the United States, did not intend the [1951 Treaty] to control claims of individuals from non-signatory nations." (Forced Labor Litigation, supra, 164 F.Supp.2d at pp. 1167-1168.)[7]

*460 2. Implied Preemption
Taiheiyo and the United States further argue that even if the 1951 Treaty does not expressly preempt section 354.6, it is implicitly preempted because the treaty establishes federal policy with respect to the war-related claims of Korean nationals. This contention likewise is without merit.
Federal law "implicitly overrides state law either when the scope of a statute indicates that Congress intended federal law to occupy a field exclusively [citation] or when state law is in actual conflict with federal law." (Freightliner Corp. v. Myrick (1995) 514 U.S. 280, 287, 115 S.Ct. 1483, 131 L.Ed.2d 385.) The Supreme Court has found implied pre-emption "where it is `impossible for a private party to comply with both state and federal requirements' [citation], or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" (Ibid.) "Pre-emption of a whole field . . . will be inferred where the field is one in which 'the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" (Hillsborough County v. Automated Medical Labs. (1985) 471 U.S. 707, 713, 105 S.Ct. 2371, 85 L.Ed.2d 714; see also Boyle v. United Technologies Corp. (1988) 487 U.S. 500, 507, 108 S.Ct. 2510,101 L.Ed.2d 442.)
Nothing in Article 14(b) or any other provision of the 1951 Treaty signals the United States' intent to occupy the entire field of claims of non-signatory nationals against Japanese corporations for unpaid labor or personal injuries suffered for slave or forced labor during WWII. The United States' waiver of claims by its nationals in Article 14(b) applies only to persons who were nationals of the United States at the time. (See Dames & Moore v. Regan (1981) 453 U.S. 654, 679-680, 101 S.Ct. 2972, 69 L.Ed.2d 918; Haven v. Polska (7th Cir.2000) 215 F.3d 727, 734.) The United States had no power to waive the claims of nationals from foreign countries and made no provision, either in the 1951 Treaty or in subsequent federal law, to prevent claims from future United States citizens who were nationals of non-signatory nations at the time of the 1951 Treaty.
The fact that the 1951 Treaty called upon Japan to enter into future negotiations with Korea does not evidence an intent to foreclose claims by individuals of non-signatory nations against Japanese nationals, either in United States courts or elsewhere. Other than encouraging Japan to enter into negotiations with Korea, the Allied Powers, including the United States, had no power or control over the outcome of such negotiations. The Allied Powers must have understood the possibility that the negotiations could fail to produce an agreement between the two countries concerning war claims, and that Korean nationals would be compelled to assert their own individual claims against Japanese nationals.
As a United States citizen, Jeong has a constitutional right of access to the courts of this state in an attempt to redress his *461 individual grievances. (See Church of Scientology v. Wollersheim (1996) 42 Cal. App.4th 628, 647-648, 49 Cal.Rptr.2d 620; California Teachers Assn. v. State of California (1999) 20 Cal.4th 327, 338-339, 84 Cal.Rptr.2d 425, 975 P.2d 622.) That fundamental right of citizenship may not be foreclosed upon a claim of implied preemption unless the language of the 1951 Treaty indicates a clear intent to exclusively occupy the field of Korean claims arising out of WWII. Such clarity is lacking in this case. The 1951 Treaty did not address claims by Korean nationals against Japanese entities conducting business in the United States for unpaid labor and personal injuries suffered during WWII. Nothing in the 1951 Treaty evidences an intent to occupy the field of claims by Korean nationals against Japanese nationals. In short, the fact that section 354.6 allows pre-existing claims to proceed in California courts by retroactively extending the applicable statute of limitations does not implicate the 1951 Treaty.
As the court in Forced Labor Litigation commented, "[A]lthough from a perspective of 2001 it may seem anomalous for the United States to negotiate a treaty that bars the claims of its own nationals without a provision that forecloses resort to a judicial forum in the United States by nationals of non-signatory nations, Article 14(b) contains no express limitation against claims of non-signatory nationals. Little should be read into this omission, which most likely can be explained by the inconceivability a half century ago of such claims by non-signatory nationals being pursued in United States courts." (Forced Labor Litigation, supra, 164 F.Supp.2d at p. 1167.) We hold the 1951 Treaty does not implicitly preempt section 354.6.

C. Section 354.6 and the Zschernig Doctrine
Taiheiyo and amicus curiae next argue that, even without consideration of the 1951 Treaty, section 354.6 is unconstitutional in its application because it impermissibly intrudes on the exclusive foreign affairs power of the United States as expressed in Zschernig. We disagree.

1. The Zschernig Doctrine
Zschernig articulated the "dormant foreign relations preemption" doctrine, which holds the federal government has exclusive power in the field of foreign relations even in the absence of any federal law or treaty. (Gerling Global Reinsurance Corp. of America v. Low (9th Cir.2001) 240 F.3d 739, 751, fn. 9 (Gerling Global); National Foreign Trade Council v. Natsios (1st Cir.1999) 181 F.3d 38, 58-59, fn. 14.) In Zschernig, the Supreme Court held, "an intrusion by the State into the field of foreign affairs which the Constitution entrusts to the President and the Congress" is unlawful if the state law "has a direct impact upon foreign relations and may well adversely affect the power of the central government to deal with those problems." (Zschernig, supra, 389 U.S. at pp. 432, 441, 88 S.Ct. 664.) States may enact laws affecting local concerns that touch upon foreign affairs, but only if their actions have "`some incidental or indirect effect in foreign nations.'" (Id. at p. 433, 88 S.Ct. 664.)
At issue in Zschernig was an Oregon statute providing that a nonresident alien's probate claim to property of Oregon decedents would escheat to the state unless the alien could show the laws of his or her country allowed inheritance of Oregon estates "without confiscation." (Zschernig, supra, 389 U.S. at p. 430, 88 S.Ct. 664.) Writing for the Court, Justice Douglas concluded, "It seems inescapable that the type of probate law that Oregon enforces affects international relations in a persistent and subtle way. The practice of state *462 courts in withholding remittances to legatees residing in Communist countries or in preventing them from assigning them is notorious. [Footnote omitted.] The several States, of course, have traditionally regulated the descent and distribution of estates. But those regulations must give way if they impair the effective exercise of the Nation's foreign policy. [Citation.] Where those laws conflict with a treaty, they must bow to the superior federal policy. [Citation.] Yet, even in absence of a treaty, a State's policy may disturb foreign relations." (Id. at pp. 440-441, 88 S.Ct. 664.)
Zschernig distinguished Clark v. Allen (1947) 331 U.S. 503, 67 S.Ct. 1431, 91 L.Ed. 1633 (Clark), which twenty years earlier upheld a similar California probate law. In Clark, a California statute provided non-resident aliens could not inherit under a will unless United States citizens were entitled to take under the laws of the foreign country on the same terms as its citizens. Again writing for the Court, Justice Douglas responded to the claim that the California statute "is an extension of state power into the field of foreign affairs, which is exclusively reserved by the Constitution to the Federal Government." (Id. at p. 516, 67 S.Ct. 1431.) Noting local law determined rights of succession of property and the California statute was neither preempted by "different or conflicting arrangements" at the federal level or treaties with another country, Justice Douglas concluded the statute did not impermissibly intrude into the field of foreign affairs. (Id. at p. 517, 67 S.Ct. 1431.) He observed, "What California has done will have some incidental or indirect effect in foreign countries. But that is true of many state laws which none would claim cross the forbidden line." (Ibid.)
The distinction between Clark and Zschernig hinged on the procedural posture of the case before the Zschernig court. The record in Zschernig contained evidence that, in the administration of statutes similar to the one in Oregon, the probate courts of various states had launched broad and inappropriate inquiries into the structure of foreign nations. The inquiries included (1) whether aliens under their laws had enforceable rights, (2) whether the "rights" were merely dispensations turning upon the whim or caprice of government officials, (3) whether the representations of consuls, ambassadors and other representatives of foreign nations were credible and made in good faith, and (4) whether any element of confiscation was present in the actual administration of the particular foreign system of law. (Zschernig, supra, 389 U.S. at pp. 433-434, 88 S.Ct. 664.) Because the inquires resulted in unavoidable criticism of other nations and posed a potential risk of disruption and embarrassment in the international arena, the Supreme Court concluded the Oregon statute had more than an incidental or indirect effect in foreign nations. "That kind of state involvement in foreign affairs and international relations . . . [,]" said Justice Douglas, "is not sanctioned by Clark v. Allen." (Id. at p. 436, 88 S.Ct. 664.)
Under Clark and Zschernig, a statute will be invalidated if its application involves a state making inappropriate inquiries and criticisms regarding the operations of foreign governments so that the statute has "more than `some incidental or indirect effect in foreign countries.'" (Zschernig, supra, 389 U.S. at p. 434, 88 S.Ct. 664; see also Gerling Global, supra, 240 F.3d at p. 752-753; Trojan Technologies, Inc. v. Com. of PA (3rd Cir.1990) 916 F.2d 903, 913 (Trojan Technologies); Marootian v. New York Life Ins. Co. (CD.Cal. Nov. 28, 2001, No. 99-12073) 2001 U.S.Dist. Lexis 22274 (Marootian); *463 see also Board of Trustees v. City of Baltimore (1989) 317 Md. 72, 562 A.2d 720, 746 [where the Maryland appellate court noted, "In explaining the distinction between Clark v. Allen and Zschernig v. Miller, courts and commentators have focused on the extensive judicial scrutiny and criticism of foreign governments to which the Court referred in the Zschernig opinion"].)[8]

2. Cases Applying Zschernig

In Trojan Technologies, the Third Circuit rejected a foreign affairs challenge by a Canadian corporation concerning a Pennsylvania "Buy American" law. The statute required suppliers who contracted with a public agency on a public works project to provide American-made products. (Trojan Technologies, supra, 916 F.2d at p. 904.) The court held the statute exhibited none of the risks identified in Zschernig. The statute did not provide an opportunity for state administrative officials or judges to comment on the nature of foreign regimes. The statute applied to products from any foreign source, without singling out any particular country. The record did not indicate the statute was selectively applied according to foreign policy attitudes of Pennsylvania officials. Finally, Congress was aware of various "Buy American" statutes, but took no action to preempt them through federal legislation. (Id. at pp. 913-914.)
In Gerling Global, the Ninth Circuit held California's Holocaust Victim's Insurance Relief Act (HVIRA) did not violate the foreign affairs doctrine under Zschernig. (Gerling Global, supra, 240 F.3d at pp. 741-742.) The HVIRA required California insurers who sold policies in Europe between 1920 and 1945 to file information about the policies with the state insurance commissioner. (See Ins.Code, § 13804, subd. (a).) The court held Zschernig did not apply to the HVIRA because the plaintiffs were businesses not foreign governments, the HVIRA did not refer to any particular country, and no evidence revealed the HVIRA would be applied in a manner that implicated the diplomatic concerns articulated in Zschernig. (Gerling Global, supra, 240 F.3d at p. 753.)
Over 30 years ago, in Estate of Horman (1971) 5 Cal.3d 62, 95 Cal.Rptr. 433, 485 P.2d 785, the California Supreme Court applied the same foreign affairs analysis used in Trojan Technologies and Gerling Global in rejecting a challenge under Zschernig. In that case, a number of citizens of the Soviet Union were heirs to a California estate. The heirs challenged the constitutionality of Probate Code section 1026, which placed a five-year time limit upon non-resident aliens to claim interests in estates. The Court held, "Probate Code, section 1026 does not involve the state in any inquiry into foreign law, administration of foreign law, credibility of foreign governmental officials or any other matter condemned by Zschernig. All that is required by Probate Code, section 1026 is the computation of five years from the date of death of the decedent. The same time period applies to all nonresident aliens alike, regardless of their country of residence, its law or its policies." (Id. at p. 80, 95 Cal.Rptr. 433, 485 P.2d 785.)
The Court concluded the statute could not "be characterized as having a `direct *464 impact upon foreign relations,' nor is it likely to `adversely affect the power of the central government to deal with' foreign relations. At most, its effect upon foreign relations is `incidental or indirect,' and it does not unconstitutionally impinge upon the exclusive and plenary power of the federal government to deal with foreign affairs." (Estate of Horman, supra, 5 Cal.3d at pp. 80-81, 95 Cal.Rptr. 433, 485 P.2d 785, citing Zschernig, supra, 389 U.S. 429, 88 S.Ct. 664, 19 L.Ed.2d 683; see also Amarel v. Connell (1988) 202 Cal.App.3d 137, 145-146, 248 Cal.Rptr. 276 [claims asserted under California anti-competition statutes do not impermissibly intrude into foreign affairs]; but see Bethlehem Steel Corp. v. Board of Commissioners (1969) 276 Cal.App.2d 221, 228, 80 Cal.Rptr. 800 [concluding California's "Buy American" statute had more than an incidental effect on foreign relations because it did impact current trade relations with foreign countries].)
Most recently, a federal district court addressed a Zschernig foreign affairs challenge to California's Armenian Genocide Victims Insurance Act. (See Marootian, supra, 2001 U.S.Dist. Lexis 22274.) The statute provides that an Armenian Genocide victim, or victim's heirs and beneficiaries, may file a legal claim in California courts to recover benefits under any insurance policy issued or in effect between 1875 and 1923. (§ 354.4.)[9] Similar to section 354.6, section 354.4 allows for venue in California courts, extends the statute of limitations on claims to 2010, and provides for retroactive application. (See § 354.4, subd. (c) and S.B.1915, § 1(d).) The defendant insurer argued the statute was unconstitutional because "`it adopts an official position on an extremely sensitive foreign affairs issue.'" (Marootian, supra, 2001 U.S.Dist. Lexis 22274 at p. 32.)
Concluding the Ninth Circuit's decision in Gerling Global was applicable to section 354.4, the court stated, "Section 354.4, which simply provides venue in the California courts for the disputed . . . insurance claims, does not require the type of wide-ranging government inquiry into a foreign government's practices which the Supreme Court found objectionable in Zschernig. As in Gerling Global, none of the parties here is a foreign government, nor owned by a foreign government; [footnote omitted] they are simply an insurance carrier and the beneficiaries under its policies of insurance. Also, like the plaintiffs in Gerling Global, [the defendant] is an insurance company that does business in California and is, or is related to, companies that issued the insurance policies at issue herein." (Marootian, supra, 2001 U.S.Dist. Lexis 22274 at p. 36.)

*465 3. Application of Zschernig to this Case
We conclude the above decisions are applicable to section 354.6. We disagree that section 354.6 creates a cause of action where none previously existed and interferes with the federal government's ability to conduct foreign affairs. Instead, we view section 354.6 as essentially a procedural statute designed to allow venue in California courts. Section 354.6 retroactively extends the statute of limitations applicable to claims for unpaid labor and personal injuries against private entities. This conclusion is based upon the following analysis.
First, we discern no improper foreign policy purpose underlying the enactment of section 354.6. The Legislature's purpose in enacting section 354.6 was to assure that "[California] residents and citizens are given a reasonable opportunity to claim their entitlement to compensation for forced or slave labor performed prior to and during the Second World War." (S.B. 1245, § 1(c).) The declared purpose behind the section is to protect the rights of residents by retroactively extending the statute of limitations applicable to preexisting claims and allowing venue in California courts. Not only do states have broad police powers to protect its residents in such a manner, but establishing a statute of limitations is a state prerogative. (See, e.g., De Canas v. Bica (1976) 424 U.S. 351, 356, 96 S.Ct. 933, 47 L.Ed.2d 43 [states have broad authority under their police powers to protect their residents]; Sun Oil Co. v. Wortman (1988) 486 U.S. 717, 722, 108 S.Ct. 2117, 100 L.Ed.2d 743 (Sun Oil) [the procedural rules of state courts, such as statute of limitations, are matters within a state's interest concerning which it may legislate]; see also People v. Frazer (1999) 21 Cal.4th 737, 758, 768, 88 Cal.Rptr.2d 312, 982 P.2d 180 [statute of limitations are an "optional form of legislative grace" and as "instruments of public policy" have never been viewed as conferring any fundamental rights rooted in the Constitution].)[10]
We reject the contention that section 354.6 was enacted for an improper foreign policy purpose because it is directed toward a specific foreign country. The statute allows recovery of uncompensated labor performed for "the Nazi regime, its allies or sympathizers, or enterprises transacting business in any of the areas occupied by or under the control of the Nazi regime or its allies and sympathizers." (§ 354.6, subds.(a)U) & (a)(2).) Section 354.6 is not aimed solely at Japanese and German companies. Any company that conducted business in "any of the areas occupied by or under the control of the Nazi regime or its allies and sympathizers" may be sued under the statute. That would include American, British, French and other companies. By its terms, section 354.6 does not target a specific foreign country nor implicate any foreign policy between the United States and Japan. (See Gerling Global, supra, 240 *466 F.3d at p. 753 [Zschernig not applicable to HVIRA, which was aimed at insurers issuing policies to persons "in Europe"].)
Second, section 354.6 does not involve the type of wide-ranging government scrutiny or criticism of a foreign government's practices that the Supreme Court found objectionable in Zschernig. The statute does not require a state court to inquire into current policy of a foreign nation or the structure of its government. In addition, the statute does not make any statement concerning or criticize the current or past foreign policies of any country. It specifically applies to pre-existing monetary claims against private companies, not to foreign governments.
Third, section 354.6 does not have more than "an incidental or indirect effect" on the federal government's current or future relations with any foreign country, such as Japan or Korea, because the statute applies retroactively, not prospectively, to claims against private companies. By allowing the initiation of actions on expired claims for unpaid labor and personal injuries suffered by workers enslaved by private companies during WWII, section 354.6 does not provide a forum to criticize Japan's current policies or practices. The litigation of such claims, at least in Jeong's case, will require evidence of his imprisonment in Korea, the conditions he endured, the type of labor he performed, the length of time he performed it at Onoda's camp, and the injuries suffered during his imprisonment. However, other than the unique circumstance that the events occurred over 50 years ago, the evidence required at trial will be similar to proof required in any civil case seeking restitution or quasi-contractual recovery for unjust enrichment, false imprisonment, or assault and battery.
There is no basis to conclude that the litigation of slave and forced labor claims will necessarily involve California courts in any criticism of Japan's present governmental structure or foreign policy. The potential that affiliates or subsidiaries of Japanese companies conducting business in California can be held liable for unpaid labor or personal injuries suffered in the past may displease those entities. It may even displease the Japanese government. However, this possible result does not implicate the impermissible governmental inquiries or criticisms the Supreme Court found objectionable in Zschernig. (See Patrickson v. Dole Food Company (9th Cir.2001) 251 F.3d 795, 803-804 [courts cannot tailor their decisions to accommodate the displeasure of non-party foreign governments].) As Justice Douglas commented, "What California has done will have some incidental or indirect effect in foreign countries. But that is true of many state laws which none would claim cross the forbidden line." (Clark, supra, 331 U.S. at p. 517, 67 S.Ct. 1431.)
In sum, section 354.6 permits actions for unpaid labor and personal injuries arising out of events that occurred during WWII. The statute permits the pre-existing claims by retroactively extending the limitations period applicable to the claims. Contrary to the arguments asserted by Taiheiyo and the United States, the fact that the claims arose during WWII does not automatically implicate the foreign affairs doctrine. Neither Taiheiyo nor the United States has cited any foreign affairs disruption that has resulted, or is likely to result, from actions brought under section 354.6.

4. Distinguishable Case Law
Taiheiyo and amici curiae cite numerous cases which have invalidated state laws under Zschernig. They argue these cases are applicable because the state laws were similar to section 354.6. The cases, however, are distinguishable.
*467 In Miami Light Project v. Miami-Dade County (S.D.Fla.2000) 97 F.Supp.2d 1174, ordinances were enacted requiring persons seeking to contract with Miami-Dade County to sign affidavits stating they did not transact business with Cuba or Cuban nationals. The ordinances were passed in response to an international incident that occurred in the Florida Straits where Cuban jet fighters shot down four pilots who were members of a humanitarian organization. In partially granting the plaintiffs' motion for a preliminary injunction, the court concluded the plaintiffs were likely to prevail on their claim that the ordinances were unconstitutional under Zschernig because "[t]he stated purpose of the [law] is to protest and condemn Cuba's totalitarian regime . . . [11] . . . [f ][and] designed to specifically impact and affect the affairs of a foreign country." (Id. at p. 1180.)
In National Foreign Trade Council v. Natsios, supra, 181 F.3d 38, a Massachusetts law was enacted restricting the ability of state agencies to purchase goods from companies doing business in Burma. The court held the law had a significant, direct effect on a foreign government and therefore inappropriately interfered with the federal foreign affairs power under Zschernig. The court arrived at this conclusion because the design and intent of the law demonstrated displeasure for Burma's human rights policies, thereby affecting that country's affairs. (Id. at p. 53.)
In Tayyari v. New Mexico State University (D.N.M.1980) 495 F.Supp. 1365, New Mexico State University passed a motion "designed to rid the campus of Iranian students." (Id. at p. 1367.) The motion sought to retaliate against Iran, which held American hostages at the time, by refusing to enroll Iranian students until the release of the hostages. The court invalidated the motion as imposing an impermissible burden on the federal government's power to regulate immigration and conduct foreign affairs because the "motion [was] directed at one nation, Iran. [The] purpose was to make a political statement about the hostage situation in Iran and to retaliate against Iranian nationals here." (Id. at pp. 1379-1380.)
In each case, the state law was invalidated because it was designed to influence a current policy of a foreign government that was considered offensive and had the potential to adversely affect trade or diplomatic relations with a foreign country. By contrast, section 354.6 is restricted to the past conduct of private companies. The statute does not permit the assertion of claims against Japan or any other country. It does not attempt to affect foreign trade or influence the policies of any foreign government.
The sole purpose of section 354.6 is to extend the statute of limitations for common law claims for unpaid labor and personal injuries arising out of slave or forced labor. Not only is this a permissible state function, but there is no reason to believe the adjudication of the claims will interfere with the federal government's ability to conduct foreign affairs. Any effect the adjudication of claims under section 354.6 may have on foreign nations is merely incidental and indirect.[11]

*468 D. Due Process
Taiheiyo contends section 354.6 violates its right to due process. Citing Phillips Petroleum Co. v. Shutts (1985) 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (Shutts) and Gerling Global Reinsurance Corp. v. Gallagher (11th Cir.2001) 267 F.3d 1228, Taiheiyo argues "California has no power to reach across the seas and into the long distant past to legislate civil penalties for parties who had no contemporaneous connection with California." This contention not only mischaracterizes section 354.6, but ignores well-established precedent that a state has the legislative jurisdiction to control the remedies available in its courts.
In Shutts, the Supreme Court held the U.S. Constitution limits a forum state's application of its substantive law to the claims of nonresident plaintiffs in a nationwide class action. In order to constitutionally apply its substantive law to the claims of nonresident class members, the forum state must have "`significant contact or significant aggregation of contacts' to the claims asserted by each member of the plaintiff class, contacts `creating state interests,' in order to ensure that the choice of [the forum state's] law is not arbitrary or unfair. [Citation.]" (Shutts, supra, 472 U.S. at pp. 821-822, 105 S.Ct. 2965.) Because in Shutts the forum state lacked interest in claims unrelated to that state asserted by nonresidents, the Court concluded the application of that state's law to every claim in the case was sufficiently arbitrary and unfair as to exceed constitutional limits. (Ibid.)
Shutts is inapplicable because section 354.6 is essentially a procedural statute designed to extend the applicable statute of limitations and allow venue in California courts. Thus, it must be evaluated under the standards the Supreme Court articulated in Sun Oil, supra, 486 U.S. 717, 108 S.Ct. 2117, 100 L.Ed.2d 743. (See Marootian, supra, 2001 U.S.Dist. Lexis 22274 at p. 36 [concluding section 354.4 (the Armenian Genocide Victims Insurance Act) is a procedural statute establishing venue in California, does not implicate due process, and should be evaluated Under Sun Oil ].)
In Sun Oil, Kansas courts applied a longer Kansas statute of limitations to claims by residents of other states concerning property located in those states and governed by the laws of those states. The Supreme Court characterized the Kansas statute of limitations as a procedural rule and concluded: "This Court has long and repeatedly held that the Constitution does not bar application of the forum State's statute of limitations to claims that in their substance are and must be governed by the law of a different State. . .. [¶] . . . [¶] . . . Since the procedural rules of its courts are surely matters on which a State is competent to legislate, it follows that a State may apply its own procedural rules to actions litigated in its courts." (Sun Oil, supra, 486 U.S. at p. 722, 108 S.Ct. 2117.)
In rejecting defendant's due process challenge, the Court added: "A State's interest in regulating the workload of its courts and determining when a claim is too stale to be adjudicated certainly suffices to give it legislative jurisdiction to control the remedies available in its courts by imposing statutes of limitations. Moreover, petitioner could in no way have been unfairly surprised by the application to it of a rule that is as old as the Republic. There is, in short, nothing in Kansas's action here that is `arbitrary or unfair,' [citation] and the due process challenge is entirely without *469 substance." (Sun Oil, supra, 486 U.S. at p. 730, 108 S.Ct. 2117.)
Section 354.6, which is placed in the Code of Civil Procedure title dealing with statute of limitations, extends the limitations period applicable to claims of slave and forced labor victims for unpaid labor and personal injuries. It further specifies that their claims may be filed and adjudicated in California courts. The statute neither specifies the essential elements of the claims nor mandates the application of California substantive law. It is, in essence, a procedural statute. Contrary to Taiheiyo's assertions, section 354.6 does not create a new cause of action where none previously existed. The claims of victims like Jeong for unpaid labor and personal injuries existed prior to section 354.6's enactment and would have been viable common law claims under California law, both when they arose and today, had they not been time-barred. (See, e.g., Philpott v. Superior Court (1934) 1 Cal.2d 512, 517, 36 P.2d 635 and McCall v. Superior Court (1934) 1 Cal.2d 527, 531, 36 P.2d 642 [recognizing right to restitution or quasi-contractual recovery based upon unjust enrichment]; Pulvermacher v. Los Angeles Co-ordinating Com. (1943) 61 Cal. App.2d 704, 143 P.2d 974 and Trube v. Katz (1923) 60 Cal.App. 474, 213 P. 264 [allowing claims for false imprisonment and assault].)[12]
Consistent with Sun Oil, by enacting section 354.6, the Legislature has assessed the workload of California courts and decided that public policy mandated a consideration of slave and forced labor claims like Jeong's, despite the length of time that had elapsed since the occurrence of events underlying those claims. (See Marootian, supra, 2001 U.S.Dist. Lexis 22274 at p. 36.)
Just as Shutts is inapplicable, so is Gerling Global Reinsurance Corp. v. Gallagher, supra, 267 F.3d 1228. In that case, the Florida insurance commissioner issued subpoenas to Florida insurers asking for information about their German affiliates' issuance of policies to Holocaust victims. The Eleventh Circuit addressed the narrow issue of whether Florida's Holocaust Victims Insurance Act (Act) could, consistent with due process, form the basis for issuance of the subpoenas. The Act required Florida insurers to file extensive information concerning Holocaust-era policies with the commissioner and authorized penalties for failing to do so. The court held the Act could not form the basis for issuance of the subpoenas because it pertained to and sought "to regulate . . . a subject matterthe German affiliates' payment or non-payment of Holocaust-era policy claimswith no jurisdictionally-significant relationship to Florida." (Id. at p. 1238.)
By contrast, section 354.6 does not seek to substantively regulate by requiring extensive reporting information to any agency, nor does it provide penalties for failing to do so. Rather, section 354.6 is essentially a procedural statute that permits slave and forced labor victims to adjudicate their claims in California courts. The claims existed prior to the enactment of the statute.
Finally, the fact that section 354.6 extends the applicable statute of limitations retroactively does not violate due process. The retroactive application of a statute is proper as long as the Legislature *470 intended to apply it retroactively, is not an ex post facto law, and does not deprive a person of a vested right without due process of law or impair the obligation of a contract. (In re Marriage of Buol (1985) 39 Cal.3d 751, 756, 218 Cal.Rptr. 31, 705 P.2d 354.) No assertion is made that section 354.6 is an ex post facto law, deprives Taiheiyo of a vested right, or impairs the obligation of a contract.
Section 354.6 is similar to statutes that revive the prosecution of otherwise timebarred criminal offenses. (See, e.g., Pen. Code, §§ 803, subds.(f), (g), (h).) Penal Code section 803, subdivision (g), for example, expressly "revived" the prosecution of certain sexual crimes against children in which the three- or six-year statute of limitations expired. In People v. Frazer, supra, 21 Cal.4th 737, 88 Cal.Rptr.2d 312, 982 P.2d 180, the Supreme Court upheld the statute against a challenge it violated due process by retroactively reviving a dead cause of action. The Court discussed Chase Securities Corp. v. Donaldson (1945) 325 U.S. 304, 65 S.Ct. 1137, 89 L.Ed. 1628, where the U.S. Supreme Court upheld retroactive changes in the applicable limitations period which were detrimental to the defense. The Court concluded, "The holding of Chasethat no constitutionally protected interest arises once a statute of limitations has run, and that such protection can be retroactively withdrawn consistent with due process has been reaffirmed by the high court in subsequent cases. [Citations.] . . . [¶] We see no meaningful basis on which to distinguish the six-year period [in this case] from the statute of limitations discussed in Chase . . .. That this case involves a criminal, rather than a civil, statute of limitations is not such a persuasive distinction. No provision of the United States Constitution explicitly confers upon criminal defendants a `right to repose' by virtue of the length of time between commission of the crime and commencement of the prosecution . . .. [¶] . . . [¶] . . . [C]riminal statutes of limitation are no less an act of `policy' or 'grace' than their counterparts in civil cases. [Citation.]" (People v. Frazer, supra, 21 Cal.4th at pp. 768-770, 88 Cal. Rptr.2d 312, 982 P.2d 180.)
Because the Legislature made clear in enacting section 354.6 that the applicable statute of limitations for slave labor and forced labor claims should be extended retroactively, we conclude retroactivity is proper and does not violate constitutional protections. (See § 354.6, subd. (c); S.B. 1245, § 1(d).)

E. Political Question Doctrine
Taiheiyo lastly contends lawsuits under section 354.6 raise non-justiciable political questions because they present claims for war reparations, which the Constitution exclusively reserved for the federal government. Taiheiyo argues the federal government dealt with the issue of Japanese war reparations through the 1951 Treaty and, as a result, California courts may not revisit or subvert this political resolution. We reject this contention.[13]
The "political question doctrine" requires courts to defer to the other branches of government operating within *471 their spheres of authority. (Schabarum v. California Legislature (1998) 60 Cal. App.4th 1205, 1213-1214, 70 Cal.Rptr.2d 745.) The doctrine "compels dismissal of a lawsuit when complete deference to the role of the legislative or executive branch is required and there is nothing upon which a court can adjudicate without impermissibly intruding upon the authority of another branch of government." (Ibid.)
Contrary to Taiheiyo's broad assertion that "[q]uestions involving interference with foreign relations are quintessential 'political questions,'" the Supreme Court has cautioned against such sweeping statements. (See Baker v. Carr (1962) 369 U.S. 186, 211, 82 S.Ct. 691, 7 L.Ed.2d 663; Japan Whaling Assn. v. American Cetacean Soc. (1986) 478 U.S. 221, 229-230, 106 S.Ct. 2860, 92 L.Ed.2d 166.) In Japan Whaling Assn. v. American Cetacean Soc., supra, the United States agreed not to certify Japan was in violation of an international whaling treaty. Conservation groups sued to force the Department of Commerce to certify Japan was in violation of the treaty. The district court granted the requested relief.
The Supreme Court rejected the contention asserted by the Japanese petitioners that the political question doctrine barred resolution of the case by the courts. The Court said, "Baker carefully pointed out that not every matter touching on politics is a political question. . .. The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch. . .. [¶] As Baker plainly held, however, the courts have the authority to construe treaties and executive agreements, and it goes without saying that interpreting congressional legislation is a recurring and accepted task for the federal courts. . .. [U]nder the Constitution, one of the Judiciary's characteristic roles is to interpret statutes, and we cannot shirk this responsibility merely because our decision may have significant political overtones. We conclude, therefore, that the present cases present a justiciable controversy. . .." (Id. at pp. 229-230, 106 S.Ct. 2860.) Other cases are in accord. (See Klinghoffer v. S.N.C. Achille Lauro (2d Cir.1991) 937 F.2d 44, 49 [political question doctrine did no bar suit against PLO for seizure, beating, and killing of passenger]; Kadic v. Karadzic (2d Cir.1995) 70 F.3d 232, 248-250 [political question doctrine did not bar private tort claims under Alien Tort Act against self-proclaimed president of the unrecognized Bosnian-Serb Republic of Srpska for systematic human rights atrocities].)
Courts confronted with actions under section 354.6 are not presented with non-justiciable political questions. Section 354.6 is essentially a procedural statute that revives stale tort and quasi-contract claims for unpaid labor and personal injuries and permits venue in California courts. The Legislature assessed the workload of California courts and determined that public policy mandates a consideration of slave and forced labor claims, despite the length of time that elapsed since the occurrences giving rise to the claims. Not only is the Legislature empowered to enact such laws in an attempt to redress the injuries of its residents, but the adjudication of similar claims is a traditional judicial function courts are called upon to address on a daily basis. Evaluating evidence concerning whether a person suffered personal injuries, was falsely imprisoned, and forced to work without pay is clearly a fact-finding function granted to the judicial branch of government. The performance of that role does not involve addressing political questions or usurp the *472 governmental functions of the legislative and executive branches.
Furthermore, contrary to Taiheiyo's contention that there are no "judicially discoverable and manageable standards" which California courts may apply to claims under section 354.6, standards do in fact exist. As another court concluded, "because the common law of tort provides clear and well-settled rules on which the district court can easily rely, this case does not require the court to render a decision in the absence of `judicially discoverable and manageable standards.'" (Klinghoffer v. S.N.C. Achille Lauro, supra, 937 F.2d at p. 49.)
In sum, Taiheiyo and amici curiae have not cited to any ongoing negotiations by the United States that address claims such as Jeong's. There is no indication that actions brought under section 354.6 will impermissibly intrude upon the authority or interest of another branch of government.

F. Conclusion
By enacting section 354.6, the California Legislature has determined that public policy mandates a judicial consideration of slave and forced labor claims despite the length of time that has elapsed since the occurrence of events underlying those claims. The Legislature has accomplished this policy by retroactively extending the limitations period for narrowly defined categories of pre-existing claims in order to permit the redress of injuries of California residents. This legislative enactment was an appropriate exercise of the state's sovereign powers. We therefore conclude section 354.6 is valid because (1) no federal treaty or other law preempts it, (2) the enactment poses at most merely an incidental or indirect effect on foreign countries, (3) the statute does not violate constitutional due process, and (4) the claims it allows do not present non-justiciable political questions.

DISPOSITION
The petition for writ of mandate is denied, the order to show cause is discharged, and the stay of trial court proceedings previously issued is dissolved. Jeong is awarded his costs.
We concur: COOPER, P.J., and RUBIN, J.
NOTES
[1] AH further statutory references are to the Code of Civil Procedure, unless otherwise indicated.
[2] Jeong alleges he represents a class of plaintiffs in the United States who were forced to perform labor for the defendants between 1929 and 1945. A class has yet to be certified.
[3] The Taiheiyo subsidiaries are (1) Taiheiyo Cement U.S.A., (2) California Portland Cement Company, and (3) Lone Star Northwest, Inc. Each subsidiary is alleged as a California corporation. Lone Star is now known as Glacier Northwest, Inc., a Washington corporation.
[4] A WWII "slave labor victim" is defined as "any person taken from a concentration camp or ghetto or diverted from transportation to a concentration camp or from a ghetto to perform labor without pay for any period of time between 1929 and 1945, by the Nazi regime, its allies and sympathizers, or enterprises transacting business in any of the areas occupied by or under control of the Nazi regime or its allies and sympathizers." (§ 354.6, subd. (a)(1).)

A WWII "forced labor victim" is defined as "any person who was a member of the civilian population conquered by the Nazi regime, its allies or sympathizers, or prisoner-of-war of the Nazi regime, its allies or sympathizers, forced to perform labor without pay for any period of time between 1929 and 1945, by the Nazi regime, its allies and sympathizers, or enterprises transacting business in any of the areas occupied by or under control of the Nazi regime or its allies and sympathizers." (§ 354.6, subd. (a)(2).)
"Compensation" means "the present value of wages and benefits that individuals should have been paid and damages for injuries sustained in connection with the labor performed . . .."(§ 354.6, subd. (a)(3).)
Other portions of the statute allow slave or forced labor victims to sue the entity or successor in interest for whom labor was performed "either directly or through a subsidiary or affiliate" and authorize interest on "the value of services at the time they were performed, compounded annually to date of full payment without diminution for wartime or postwar currency devaluation." (§ 354.6, subds.(a)(3) & (b).) The parties make only passing reference to these provisions in their written submissions to this court. Consequently, we do not address them.
[5] In June 1965, Japan and the Republic of Korea entered into an agreement concerning war claims. (See Agreement on the Settlement of Problems Concerning Property and Claims and on the Economic Co-operation Between Japan and the Republic of Korea, June 22, 2965, 8473 U.N.T.S. 258.) Taiheiyo does not contend in its petition that the 1965 Treaty expressly preempts Jeong's claims under section 354.6. Rather, Taiheiyo and the United States contend the treaty, as incorporated by reference into the 1951 Treaty, demonstrated the U.S. Congress's overall purpose and intent to preempt the field of war-related claims. We address this implied preemption argument below.
[6] Article 26 provides, in relevant part: "Japan will be prepared to conclude with any State . . . which is not a signatory to the present Treaty, a bilateral Treaty of Peace on the same or substantially the same terms as are provided for in the present Treaty, but this obligation on the part of Japan will expire three years after the first coming into force of the present Treaty." (1951 Treaty, supra, 3 U.S.T. at p. 3190.)
[7] Not only do Articles 4(a) and 14(b) demonstrate an intent that the treaty did not bind non-signatory nations such as Korea and China, but the waiver provisions are not as broad as Taiheiyo and amici curiae contend. Article 140?) waives claims arising out of actions "taken in the course of the prosecution of the war." As one commentator suggests, it is reasonable to interpret this clause to exclude actions taken by private Japanese companies for profit as not being actions taken in the "course of the prosecution of the war." (See Bazyler, The Holocaust Restitution Movement in Comparative Perspective (2002) 20 Berkeley J. Int'l Law, 11, r-22 [citing Kawakita v. United States (1952) 343 U.S. 717, 727-728, 72 S.Ct. 950, 96 L.Ed. 1249, where the Supreme Court concluded Japanese companies doing business during the war should be viewed as nothing more than private, profit-making ventures].)
[8] Zschernig remains the only case where the Supreme Court invalidated a state statute because it violated the foreign affairs power. (See Barclays Bank PLC v. Franchise Tax Bd. of Cal. (1994) 512 U.S. 298, 328, 114 S.Ct. 2268, 129 L.Ed.2d 244 [where the Supreme Court made clear that in the absence of controlling federal law, courts have no authority to identify the foreign relations affects of a state law and weigh them against the competing legitimate interests of states].)
[9] Section 354.4 defines "Armenian Genocide victim" as "any person of Armenian or other ancestry living in the Ottoman Empire during the period of 1915 to 1923, inclusive, who died, was deported, or escaped to avoid persecution during that period." (§ 354.4, subd. (a)(1).) The statute further provides, in relevant part: "(b) Notwithstanding any other provision of law, any Armenian Genocide victim, or heir or beneficiary of an Armenian Genocide victim, who resides in this state and has a claim arising out of an insurance policy or policies purchased or in effect in Europe or Asia between 1875 and 1923 from an insurer described in paragraph (2) of subdivision (a), may bring a legal action or may continue a pending legal action to recover on that claim in any court of competent jurisdiction in this state, which court shall be deemed the proper forum for that action until its completion or resolution, [f] (c) Any action, including any pending action brought by an Armenian Genocide victim or the heir or beneficiary of an Armenian Genocide victim, whether a resident or nonresident of this state, seeking benefits under the insurance policies issued or in effect between 1875 and 1923 shall not be dismissed for failure to comply with the applicable statute of limitation, provided the action is filed on or before December 31, 2010."
[10] Taiheiyo and the United States cite a Los Angeles Times article quoting the legislative author of section 354.6 as indicative of its legislative purpose. Unofficial comments by a single legislative sponsor shed no light on the true intent of the enactment. (See California Teachers Assn. v. San Diego Community College Dist. (1981) 28 Cal.3d 692, 699-700, 170 Cal.Rptr. 817, 621 P.2d 856 [the use of a single senator's statements to determine legislative intent violates well-established principles of statutory construction, even where the senator actually authored the bill in controversy]; Honey Springs Homeowners Assn. v. Board of Supervisors (1984) 157 Cal.App.3d 1122, 1134, 203 Cal.Rptr. 886 [judiciary is reluctant to rely on statements by individual members of the Legislature as an expression of the intent of the entire body].)
[11] Other cases cited by Taiheiyo and amici curiae are similarly distinguishable. (See Springfield Rare Coin Galleries v. Johnson (1986) 115 Ill.2d 221, 236, 104 Ill.Dec. 743, 503 N.E.2d 300 [regulation exempting all gold and silver coins from taxation except the Krugerrand held invalid because it was designed to express disapproval of South Africa's apartheid policy]; New York Times Co. v. City of New York Com'n (1977) 41 N.Y.2d 345, 352, 393 N.Y.S.2d 312, 361 N.E.2d 963 [city prohibition on advertising job opportunities in South Africa held impermissible because its purpose was to impose an economic boycott aimed at South Africa's apartheid policy].)
[12] We do not decide whether California substantive law should apply to the claims for unpaid labor and personal injuries asserted in this case. We conclude only that section 354.6 may validly be applied to revive and retroactively extend the statute of limitations applicable to such claims.
[13] Jeong contends Taiheiyo's political question argument is not properly before the court because that argument was raised only in Taiheiyo's initial motion for judgment on the pleadings, which the trial court denied and from which Taiheiyo did not seek appellate review. The order to show cause limited our review to the trial court's denial of Taiheiyo's second motion for judgment on the pleadings, in which the political question argument was not raised. We nonetheless address it because it is an issue of law that was fully briefed and argued by the parties.